**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


John Farrelly

    v.                                    Civil No. 10-cv-583-LM
                                                Opinion No. 2012 DNH 166
City of Concord, N.H.; Eric
J. Pichler; and Walter Carroll


**<u>AMENDED ORDER</u>**

John Farrelly has sued in eight counts, asserting both
federal and state claims arising out of his arrest by Officer
Eric Pichler of the Concord Police Department, and his
prosecution, in 2009, for violating N.H. Rev. Stat. ("RSA") §
644:4, I(f), which had been ruled unconstitutional by the New
Hampshire Supreme Court in 2005.  Before the court are
Farrelly's motion to amend his amended complaint and defendants'
motion for summary judgment.  Each motion is duly opposed.  The
court heard oral argument on defendants' motion for summary
judgment on July 27, 2012.  For the reasons that follow,
Farrelly's motion to amend is granted, and defendants' motion
for summary judgment is granted in part and denied in part.


**Motion to Amend**

Farrelly moves, pursuant to Rule 15(b) of the Federal Rules
of Civil Procedure, to amend his complaint.  He seeks to correct
three typographical errors in his factual narrative and to bring
his claims into conformance with the evidence of record and

certain arguments that have already been joined by the defendants in their motion for summary judgment.  Specifically, he seeks to amend Counts III, VII, and VIII.  Defendants object, arguing that the relevant rule of procedure is 16(b) rather than 15(b), and that Farrelly has not established the "good cause" required by Rule 16(b).  Farrelly does not acknowledge the standard established in Rule 16(b), or attempt to meet it. Strictly speaking, he is probably not entitled to amend his complaint.  However, defendants have addressed the relevant issues raised by Farrelly's proposed amendments in their motion for summary judgment and so, would not be prejudiced if the court were to allow Farrelly to amend his complaint again.[1]  For that reason, Farrelly's motion to amend is granted.  That said, while the proposed amended complaint, document no. 40-1, bears the caption "Amended Complaint," the court will refer to that document as "Second Amended Complaint," to distinguish it from document no. 32, which is Farrelly's first amended complaint.

---

[1] Moreover, even with Farrelly's proposed amendments, defendants are entitled to summary judgment on all three of the counts Farrelly seeks to amend, as explained below, which further demonstrates the lack of prejudice to defendants.

## Summary Judgment Standard

"To prevail on summary judgment, the moving party must show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 29 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a)).  "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

## Background

Unless otherwise indicated, the following facts are undisputed.[2]

---

[2] While Farrelly's memorandum of law includes a section captioned "Statement of Material Facts in Dispute," his inclusion of immaterial background facts, additional facts not mentioned in defendants' memorandum, and mixed questions of fact and law diminishes the utility of that statement for the purpose described in LR 7.2(b)(2), which is the identification of genuine disputes of material fact that require a trial.

For approximately three years, Farrelly lived with Kerri Corliss and her young daughter, Hanah.  Farrelly and Corliss broke up in November of 2008.  The events giving rise to this case began with e-mails Farrelly sent to Corliss about three months later, on February 16, February 18 (three e-mails), and February 21 of 2009.

In response to Farrelly's February 16 e-mail, titled "WHY ARE YOU SO MEAN TO HANAH?", Corliss e-mailed the following response:

> [S]top contacting me or I will go to the police for blackmail and harassment.  My father has already warned you, and has begged me to go to the police!!! Hanah is not your child, and I will [be] and am doing everything to keep you away from her.

Answer, Ex. B (doc. no. 34-2), at 4.  Farrelly responded with three e-mails on February 18 (sent at 6:06, 7:29, and 8:35 p.m.) in which he expressed his disapproval of Corliss's new nipple piercings and his concern over what Hanah would think of them. The full text of the first e-mail is as follows:

> HAPPY 30TH BIRTHDAY A DAY EARLY.  I hope you like your new piercings, just wait until Hanah sees them.  What were you thinking of???  You are a Mother for God's sakes.

Id. at 3.  The full text of the second e-mail is as follows:

> WHAT EVER KERRI.  SO I HEAR EVERYONE AT THE HOSPITAL SAW YOUR NEW NIPPLES PIERCINGS.  WHY HAVE YOU TURNED INTO SUCH A TRAMP?  S [sic] WHAT IS HANAH GOING TO THINK OF THEM?

Id. at 4.  The full text of the third e-mail is as follows:

4

> WHY CONTACT GEORGE WITH REGARDS TO YOUR NIPPLE
> PIERCINGS?  HE JUST CALLED ME TO ASK WHERE I HEARD ALL
> ABOUT THIS AND I SAID WHAT DIFFERENCE DOES IT MAKE.
> IT WASN'T GEORGE.  WHEN YOU SHOW IT TO AS MANY PEOPLE
> THAT YOU SHOWED THE PICTURES TO DON'T YOU THINK THAT
> IT WOULD GET BACK TO ME.
>
> SO NOW I KNOW WHERE THE TAX RETURN IS GOING.  DON'T
> SAVE A DIME.  SPEND IT ON CRAZY SHIT.  WHAT'S NEXT?  A
> TRAMP STAMP?  MORE FALSE ADVERTISING.
>
> NO WONDER YOU MOVED OUT WHEN YOU DID.  YOU DIDN'T WANT
> ANY OF THE TAX MONEY TO BE SPENT ON PAYING YOUR DEBT
> OFF.  DON'T WORRY THOUGH AS I AM STILL THINKING ABOUT
> A CIVIL CASE TO GET MY MONEY BACK FROM YOU.  I HAVE
> ALL THE CHECKS AND ALL THE CREDIT CARD RECEIPTS.  I
> BET A JUDGE WON'T SEE IT ALL YOUR WAY.  AFTER ALL IT
> ALL BEING A GIFT AS YOU SAY JUST DOESN'T MAKE SENSE.
> WHO EVER HEARD OF A GIFT FOR A CROWN FOR YOUR TOOTH.
>
> HAVE A[N] AWFUL LIFE AND HOPEFULLY HANAH DOESN'T GROW
> UP TO BE LIKE YOU.

Id. at 5.

In the early morning hours of February 21, Farrelly sent
Corliss a relatively long e-mail, titled "HAPPY 30TH YOU LYING
CHEATING HERPES CARRYING JEZEBEL."  Answer, Ex. B (doc. no. 34-
2), at 1.  In the Jezebel e-mail, Farrelly: (1) called Corliss a
"little slut"; (2) threatened to show up at her birthday party
and announce that she had given him herpes and had stolen
$100,000 from him; and (3) described two incidents of a sexual
nature involving Corliss.  See id. at 1-2.  In one of those
descriptions, Farrelly wrote about Corliss: "stripp[ing] off
[her] top," id. at 1; "rubb[ing] [her] $6000.00 TITS" in a man's
face, id.; and then "invit[ing] him to play and suck on them,"

id.  In the other, he mentioned a man he referred to as "the
love of [Corliss's] life where [she] told him in front of
everyone" that she wanted to perform an act of oral sex on him.
Id. at 2.

On the morning of February 21, shortly after she received
the Jezebel e-mail, Corliss went to the Concord Police
Department to complain about Farrelly.  She initially spoke with
Lieutenant Walter Carroll, a shift superintendent.  Lt. Carroll
had Corliss meet with Officer Eric Pichler, who wrote, in his
narrative report: "She told me that she was scared he was going
to show up at her [birthday] party and hurt her or her daughter.
She was very emotional and had tears in her eyes while talking
with me."  Answer, Ex. A (doc. no. 34-1), at 2.  At his
deposition, Officer Pichler described his interview with
Corliss:

> Q.  Now, you said that Ms. Corliss didn't necessarily
>     want you to arrest Mr. Farrelly.  Did she tell
>     you what she wanted you to do?
>
> A.  She told me that she was scared that he, Mr.
>     Farrelly, kept contacting her, that his
>     communications were upsetting her and she felt
>     harassed and wanted the communication to stop.
>     She wanted him out of her life.
>
> Q.  Did she say when she was scared what she [was]
>     afraid of?  Did she tell you?
>
> A.  She told me that there were several instances
>     where Mr. Farrelly's anger, where he got out of
>     control, as she described it, and she felt that
>     her, that she was in danger of being injured or

being hurt.  She had mentioned several times that
they did get physical, not all the times that
that happened were the police involved, but as
far as this specific instance her main concern
was that she didn't want it to arise to that
level.  She felt that if he kept communicating
with her and showed up at her party that
something might happen and she feared for her
safety and the safety of her daughter.

. . . .

Q.   But did Ms. Corliss ever verbalize to you any
     specific concern that she had for Mr. Farrelly
     that he was going to do something specific to
     her?

A.   Not at this time.  She didn't know.  She was
     afraid that something might happen, but she
     didn't say that he made any specific threats or
     else I would have pursued criminal threatening.

Defs.' Mot. Summ. J., Moskowitz Aff., Ex. 1, Pichler Dep. (doc.

no. 36-3), at 53-54, 57.  Officer Pichler also took a written

statement from Corliss that says, in its entirety:

I lived w/ John Farrelly for three years.
[O]n Thanksgiving I had to call the police for his
aggressive behavior.  I moved out the next day.
[H]is phone calls and emails to my friends and family
have been ongoing.  I have asked him to stop several
times, he has failed to do so.

His emails are harassing, and say inappropriate things
about me, my friends and family.

Id. at 4.  In addition to giving a statement, Corliss provided

Officer Pichler with both the e-mails she had received from

Farrelly and e-mails exchanged between Farrelly and her father,

James Cross.  It is undisputed that Cross is a retired Concord

police officer.

After speaking with Corliss, Officer Pichler consulted with Lt. Carroll.  Among other things, the two officers compared Farrelly's conduct, as reported by Corliss, to the conduct prohibited by New Hampshire's harassment statute, RSA 644:4, as reported in the 2008-2009 edition of the <u>New Hampshire Criminal Code Annotated</u> published by LexisNexis.  In particular, they discussed the applicability of RSA 644:4, I(b) and (f).  In the version of the criminal code they were using, under the heading "Notes to Decisions," the section on RSA 644:4 includes an annotation indicating that RSA 644:4, I(f) had been declared unconstitutional by the New Hampshire Supreme Court in <u>State v. Pierce</u>, 152 N.H. 790 (2005).  Neither officer took notice of the annotation.

Shortly after noon on February 21, Officer Pichler went to Farrelly's residence, to get his side of the story.  When Officer Pichler arrived, accompanied by another officer, Farrelly said that he knew why the officers were there, explained that he was intoxicated when he sent the Jezebel e-mail, and then apologized for sending it.  Farrelly also admitted that he had received Corliss's e-mail asking him to stop contacting her, and "that his language was pretty vulgar in the e-mails," Pichler Dep. (doc. no. 36-3), at 84.  At his deposition, Officer Pichler testified that when he spoke with Farrelly, Farrelly did not "say or do anything . . . that

8

suggested he was a threat to Ms. Corliss's safety." Id. at 50.
Officer Pichler also testified that he did not determine that
Farrelly "presented a credible present threat to [Corliss's]
safety." Id. at 51.

Officer Pichler then arrested Farrelly, without a warrant,
for criminal harassment. He made a warrantless arrest because
he thought he was permitted to do so by RSA 594:10, I(b), based
on his belief that Farrelly had committed domestic abuse, as
defined in RSA 173-B:1, I, within the previous twelve hours.

At his deposition, Farrelly testified that as the two
officers were escorting him down the stairs of his residence,
Officer Pichler told him: "This is what you get for fucking with
a 30-year veteran of the Concord PD." Pl.'s Obj., Farrelly Dep.
(doc. no. 38-6), at 4. Defendants have produced evidence that
Pichler said no such thing, and that he did not learn, until
after this action was filed, that Corliss's father had once been
a Concord police officer. See Pichler Dep. (doc. no. 36-3), at
102-03. The record also includes evidence that Lt. Carroll had
worked with Corliss's father for approximately twenty years, and
that he was acquainted with Corliss herself. See Defs.' Mot.
Summ. J., Moskowitz Aff., Ex. 2, Carroll Dep. (doc. no. 36-4),
at 8-12.

Three days after Farrelly was arrested, four criminal
complaints were sworn out against him, three for the e-mails he

sent on February 18 and one for the Jezebel e-mail.  Officer

Pichler and Lt. Carroll worked together to draft the complaints.[3]

Each complaint charged Farrelly with the offense of harassment,

in violation of RSA 644:4, based on allegations that Farrelly

did

> PURPOSELY communicate through e-mail with a purpose to
> annoy another, to wit, Kerri Corliss, in that the
> defendant sent Corliss an e-mail after she previously
> notified him on 02/17/2009 at 0806 not to contact her
> for any reason or she would call the police, the
> communication being not for a lawful purpose.

Answer, Ex. D (doc. no. 34-4), at 1.  That charge closely tracks

the language of the provision declared unconstitutional in

Pierce, under which "[a] person is guilty of a misdemeanor" when

he or she

> [w]ith the purpose to annoy or alarm another, having
> been previously notified that the recipient does not
> desire further communication, communicates with such
> person, when the communication is not for a lawful
> purpose or constitutionally protected.

RSA 644:4, I(f).  The charges against Farrelly were dropped

before trial, due to the unconstitutionality of RSA 644:4, I(f).

---

[3] Officer Pichler has testified that he and Lt. Carroll
drafted the complaints.  See Pichler Dep. (doc. no. 36-3), at
17.  Lt. Carroll has testified that he was not sure who drafted
them.  See Carroll Dep. (doc. no. 36-4), at 30-31.  In their
memorandum of law, defendants say it is undisputed that the
officers drafted the complaints together.  See Defs.' Mem. of
Law (doc. no. 36-1), at 4-5.  Farrelly does not challenge the
joint attribution of the charging decision in his Rule 7.2(b)(2)
statement of facts.  Accordingly, the court takes it as
undisputed that both officers drafted the complaints.

Farrelly has sued in eight counts.  By means of 42 U.S.C. §
1983, he claims that defendants violated his federal
constitutional rights to: (1) due process (Count I); freedom of
speech (Count II); and (3) freedom from unreasonable seizure
(Count III).  He also uses § 1983 to bring a claim titled
"Failure to Supervise Prosecutorial Function" against the City
of Concord (Count VII).  In addition, Farrelly asserts a claim
under the New Hampshire Constitution (Count VI), and claims
under the common law of New Hampshire for: (1) malicious
prosecution (Count IV); (2) false imprisonment (Count V); and
(3) negligence (Count VIII).

## Discussion

Defendants move for summary judgment and advance the
following arguments: (1) the entire action is barred by RSA
594:13, because Farrelly's arrest was lawful, due to the
existence of probable cause to arrest him for violating RSA
644:4, I(b), under which it is a misdemeanor for a person to
"[m]ake[ ] repeated communications at extremely inconvenient
hours or in offensively coarse language with a purpose to annoy
or alarm another"; (2) defendants Pichler and Carroll are
protected by qualified immunity, which entitles them to summary
judgment on Counts I, II, and III; (3) the City of Concord

11

("City") is protected by "municipal immunity,"[4] which entitles it to summary judgment on Counts I, II, III, and VII; (4) all defendants are protected by statutory immunity,[5] which entitles them to summary judgment on Counts IV, V, VI, and VIII; (5) Officer Pichler and Lt. Carroll are protected by official immunity, and the City is protected by vicarious official immunity, which entitles them to summary judgment on Counts IV, V, VI, and VIII; and (6) the City is protected by discretionary-function immunity, which entitles it to summary judgment on Count VIII.  Farrelly disagrees, categorically.  In the discussion that follows, the court considers each of Farrelly's claims individually, beginning with his federal claims.

A. Federal Claims

Farrelly brings all of his federal claims through the mechanism of § 1983, under which

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

---

[4] By "municipal immunity," defendants refer to several of the rules of law governing the liability of municipalities under § 1983 that are described in Monell v. Department of Social Services, 436 U.S. 658 (1978).

[5] By "statutory immunity," defendants refer to their theory that RSA 507-B:5 provides them with immunity from liability.

12

> action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983.  "To make out a viable cause of action under

section 1983, a plaintiff must allege that the defendants, while

acting under color of state law, deprived him of rights secured

by the Constitution or federal law."  Rojas-Velázquez v.

Figueroa-Sancha, 676 F.3d 206, 209 (2012) (citing Santiago v.

Puerto Rico, 655 F.3d 61, 68 (1st Cir. 2011)).  While § 1983

permits claims against individuals "acting under color of state

law," Rojas-Velásquez, 676 F.3d at 209, "a local government may

not be sued under § 1983 for an injury inflicted solely by its

employees or agents."  Monell v. Dep't of Soc. Servs., 436 U.S.

658, 694 (1978).  "Instead, it is when execution of a

government's policy or custom . . . inflicts the injury that the

government entity is responsible under § 1983."  Id.

### 1. Count I: Due Process

Without specifying the particular defendant(s) to which it

applies, Count I states, in full:

> The action of Defendants in arresting the Plaintiff
> under a criminal statute which had been previously
> determined to be unconstitutional violated the
> Plaintiff's right to the Due Process of Law.

Second Am. Compl. (doc. no. 40-1) ¶ 33.

Of the three defendants in this case, only one of them,

Officer Pichler, arrested Farrelly.  Farrelly does, however,

13

allege that the decision to arrest him was "approved by
Defendant Carroll on behalf of the Concord Police Department,"
Second Am. Compl. ¶ 22, which at least hints at a claim for
supervisory liability against Lt. Carroll, see Grajales v. P.R.
Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012) (describing the
circumstances under which a claim based on supervisory liability
may arise under § 1983) (citing Welch v. Ciampa, 542 F.3d 927,
937 (1st Cir. 2008)).  While Farrelly's complaint and his
memorandum of law are far from clear on this point, and
generally speak of defendants collectively rather than in terms
of individual liability, the court will presume that to the
extent that Counts I, II, and III assert claims based on
Farrelly's arrest, his claims against Lt. Carroll rest on a
theory of supervisory liability.  But see Grajales, 682 F.3d at
47 (explaining, in the context of a § 1983 supervisory liability
claim, that "the case law requires a separate assessment of the
potential liability of each of the defendants") (citing Rogan v.
Menino, 175 F.3d 75, 77 (1st Cir. 1999)).

    Defendants argue that they are entitled to summary judgment
on Count I because: (1) there was probable cause to arrest
Farrelly for violating RSA 644:4, I(b), which renders his arrest
lawful under RSA 594:13; (2) Officer Pichler and Lt. Carroll are
entitled to qualified immunity; and (3) the City is entitled to
municipal immunity.  Farrelly contends that: (1) the Federal

Constitution and the policies behind 42 U.S.C. § 1983 trump RSA

594:13;[6] and (2) the defendant officers are not entitled to

qualified immunity.

Defendants' municipal-immunity argument and Farrelly's

response to it raise an issue that merits some attention.  Under

the rubric of "municipal immunity," defendants argue that: (1)

the City may not be held vicariously liable for the conduct of

Officer Pichler and Lt. Carroll under § 1983;[7] (2) Officer

Pichler and Lt. Carroll did not violate Farrelly's

constitutional rights, which entitles the City to judgment as a

_____

[6] The court need not resolve Farrelly's apparent preemption
argument, as there does not appear to be a conflict between RSA
594:13 and federal law.  The former provides that "[i]f a lawful
cause of arrest exists, the arrest will be lawful even though
the officer charged the wrong offense or gave a reason that did
not justify the arrest."  RSA 594:13.  Under federal law:

> the probable cause inquiry is not necessarily based
> upon the offense actually invoked by the arresting
> officer but upon whether the facts known at the time
> of the arrest objectively provided probable cause to
> arrest.  Devenpeck v. Alford, 543 U.S. 146, [153]
> (2004).  Thus it is irrelevant that the booking
> officer cited Jones for "intent to rob while armed."
> If, on the facts known to the arresting officers,
> there was probable cause to believe he was committing
> another crime, the arrest was valid.

United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005)
(parallel citations omitted).  Based on Jones, the court cannot
discern any difference between federal and state law on this
point.

[7] Farrelly disclaims any reliance upon vicarious liability
for his federal constitutional claims, see Pl.'s Mem. of Law
(doc. no. 38-1), at 14, so the court need say nothing more about
this aspect of defendant's theory of "municipal immunity."

matter of law on Farrelly's <u>Monell</u> claim(s), <u>i.e.</u>, claim(s) that

his constitutional rights were violated as a result of the

execution of a municipal policy or custom; and (3) even if

Officer Pichler and Lt. Carroll did violate Farrelly's

constitutional rights, Farrelly has failed to identify a

municipal policy or custom the execution of which caused his

injury.  Farrelly responds by arguing that "[i]t is clear from

the officers' testimony that they were not informed about the

three year old ruling on RSA 644:4(I)(f), or the need to consult

annotations . . . [and] that those failures directly led to

[his] arrest."  Pl.'s Mem. of Law (doc. no. 38-1), at 14.

Before addressing the merits of Farrelly's <u>Monell</u> claim(s), the

court must first determine which count or counts in the second

amended complaint assert a claim or claims for <u>Monell</u> liability.

    Plainly, such a claim is stated in Count VII.  The City is

the only defendant identified in Count VII, and the claim stated

therein refers to the City's policy or custom of failing to

adequately: (1) educate its officers on recent decisions of the

New Hampshire Supreme Court; and (2) train its officers in how

to ascertain the constitutionality of the criminal statutes they

are charged with enforcing.  What is less clear is whether

<u>Monell</u> claims are also stated in Counts I-III.

    On the one hand, the only fact alleged <u>in those counts</u> is

Farrelly's arrest; those counts say nothing about any policy or

custom instituted or maintained by the City.  On the other hand,
each of those counts asserts liability against defendants, not
just Officer Pichler and Lt. Carroll.  Farrelly's memorandum of
law in support of his objection to summary judgment includes the
following heading: "Claims Against the City Under 42 U.S.C. §
1983," which tends to suggest that Farrelly is asserting one or
more Monell claims in addition to the one stated in Count VII.
While the court is mindful that Farrelly is "not entitled to
raise new and unadvertised theories of liability for the first
time in opposition to a motion for summary judgment," Calvi v.
Knox Cnty., 470 F.3d 422, 431 (1st Cir. 2006) (citing Torres-
Rios v. LPS Labs., Inc., 152 F.3d 11, 15-16 (1st Cir. 1998)),
the court cannot say that Counts I-III, as sketchy as they are,
do not at least "vaguely insinuate[ ]" Monell claims, see Calvi,
470 F.3d at 430 (affirming district court's decision to deem
waived claims introduced for the first time in opposition to
summary judgment that were not "articulated, or even vaguely
insinuated in [the plaintiff's] complaint").  And, in any event,
by mounting a "municipal immunity" defense to Counts I-III,
defendants have demonstrated their understanding that Counts I-
III do assert Monell claims.  Accordingly, the court follows
defendants in construing Counts I-III as asserting both claims
against Officer Pichler and Lt. Carroll and Monell claims
against the City.

17

That said, further discussion of Count I is warranted.   It
is based on a single act, Pichler's arresting Farrelly "under a
criminal statute which had been previously determined to be
unconstitutional."  Second Am. Compl. (doc. no. 40-1) ¶ 33.
According to Farrelly, the arrest violated his right to due
process.  See id.  Given the factual allegations on which it is
based, Count I cannot be understood as anything other than a
claim for false arrest.  Ordinarily, a false-arrest claim
brought pursuant to 42 U.S.C. § 1983 asserts a violation of the
plaintiff's rights under the Fourth Amendment.  See, e.g.,
Collins v. Univ. of N.H., 664 F.3d 8, 14 (1st Cir. 2011); see
also Acosta, 386 F.3d at 9.  Indeed, Farrelly himself asserts a
Fourth Amendment false-arrest claim in Count III.

So, the question becomes whether an allegedly false arrest
can also support a claim under the Due Process Clause.  In his
objection to summary judgment, Farrelly cites Cook v. Sheldon,
41 F.3d 73 (2d Cir. 1994), for the proposition that "it was a
violation of [his] right to procedural due process to arrest him
for vindictive reasons on an invalid charge," Pl.'s Mem. of Law
(doc. no. 38-1), at 9.  But, the purported due-process violation
in Cook did not involve the plaintiff's arrest.[8]

_____

[8] The plaintiff in Cook did assert a claim based on his
allegation of a false arrest, but that claim, like Count III in
this case, was pled as a violation of the plaintiff's rights
under the Fourth Amendment.  See 41 F.3d at 77-78.

Rather, the court of appeals in Cook held that
"[p]rocedural due process forbids the use of legal process for a
wrongful purpose," Cook, 41 F.3d at 80 (citing Torres v. Super.
of Police, 893 F.2d 404, 410 (1st Cir. 1990)) (emphasis added),
and drew the elements of the due-process claim from the state-
law tort of malicious abuse of process, see Cook, 41 F.3d at 80
(citations omitted).  As for what constitutes legal process, the
defendants in Cook "clearly employed criminal process against
Cook by having him arraigned on charges of illegal possession of
a car with no VIN."  Id.; cf. Harrington v. City of Nashua, 610
F.3d 24, 32 (1st Cir. 2010) (explaining that warrantless arrest
is not legal process for purposes of Fourth Amendment malicious-
prosecution claim).  Here, Count I alleges an arrest under an
unconstitutional statute, but makes no allegations concerning
the initiation of criminal proceedings or any other use of legal
process.

Based on the foregoing, two things are clear about Count I:
(1) Farrelly has identified no authority for the proposition
that a false arrest may serve as the factual basis for a due-
process claim; and (2) he has alleged no facts to support a
claim for malicious prosecution or abuse of process.  Count I,
therefore, does not even state a claim on which relief can be
granted, see United Auto. Workers of Am. Int'l Union v. Fortuño,
633 F.3d 37, 40 (1st Cir. 2011).  Thus, Officer Pichler and Lt.

Carroll are entitled to judgment as a matter of law on Count I.
And, because the individual defendants are entitled to judgment
as a matter of law, so, too, is the City entitled to judgment as
a matter of law on Farrelly's Count I Monell claim.  See City of
L.A. v. Heller, 475 U.S. 796, 799 (1986) ("If a person has
suffered no constitutional injury at the hands of the individual
police officer[s], the fact that the departmental regulations
may have authorized the use of constitutionally excessive force
is beside the point").

     Finally, the court notes that even if it were to construe
Count I as asserting a due-process claim based not on false
arrest but on malicious prosecution or abuse of process, such
claims would fail as a matter of law.  It is well established in
this circuit "the Due Process Clause cannot serve to ground [a]
federal malicious prosecution claim," Nieves v. McSweeney, 241
F.3d 46, 53 (1st Cir. 2001), and "the First Circuit does not
recognize § 1983 claims based upon an alleged abuse of process,"
Boyle v. Barnstable Police Dep't, 818 F. Supp. 2d 284, 316 (D.
Mass. 2011) (citing Faust v. Coakley, Civ. Action No. 07-11209-
RWZ, 2008 WL 190769, at *4 (D. Mass. Jan. 8, 2008)); see also
Santiago v. Fenton, 891 F.2d 373, 388 (1st Cir. 1989).

2. Count II: First Amendment Freedom of Speech

Without specifying the particular defendant(s) to which it applies, Count II states, in full:

> The action of Defendants in arresting Plaintiff for criminal harassment arising out of Plaintiff's e-mail communication with his former girlfriend violated his right to freedom of speech.

Second Am. Compl. (doc. no. 40-1) ¶ 34.  In the memorandum of law in support of his objection to summary judgment, Farrelly offers further clarification of his First Amendment claim:

> Defendants' attempt to convert this case into a mistake over which section of the Criminal Harassment statute was utilized fails because the arrest of the Plaintiff under either (b) or (f) of that Statute would have violated his First Amendment freedom of speech.  On this date, the Supreme Court in the case of U.S. v. Alvarez, 567 U.S. ____ (2012), (plurality opinion), has reaffirmed its prior holdings that "'as a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'  Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002).  As a result, the Constitution 'demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality.'"  Ashcroft v. American Civil Liberties Union, 542 U.S. 656, 660 (2004).  Slip opinion at 4.
>
> In its opinion, the Court made clear that content-based restrictions on speech, even false speech, are only permitted in a few "'historic and traditional categories [of expression] long familiar to the bar ..'"  Slip opinion at 4-5 (citations omitted).  Accordingly it held unconstitutional a federal criminal statute which prohibited false statements about military service.

> The application of the Criminal Harassment
> Statute against the Plaintiff in this case
> was likewise an unconstitutional prior restraint on his
> freedom of speech.  Although his language and ideas
> were blunt and controversial, and presumably not
> welcomed by the recipient, they did not fall under any
> of the exceptions to First Amendment protected speech.

Pl.'s Mem. of Law (doc. no. 38-1), at 7-8.

Defendants argue that they are entitled to summary judgment on Count II because: (1) there was probable cause for Farrelly's arrest, which renders the arrest lawful under RSA 594:13; (2) Officer Pichler and Lt. Carroll are entitled to qualified immunity; and (3) the City is entitled to municipal immunity from Farrelly's Monell claim.  Farrelly contends that: (1) the Federal Constitution and the policies behind 42 U.S.C. § 1983 trump RSA 594:13; (2) the defendant officers are not entitled to qualified immunity; and (3) with respect to the Monell claim in Count II, the deposition testimony of Officer Pichler and Lt. Carroll demonstrates the inadequacy of the training they were provided by the City.  Defendants are entitled to the immunities they claim.

### a. Qualified Immunity

Defendants argue that Officer Pichler and Lt. Carroll are entitled to qualified immunity because: (1) the facts Farrelly "allege[s] do not make out a violation of a constitutional right," Defs.' Mem. of Law (doc. no. 36-1), at 9; (2) "the law is not clear that the decision to arrest a suspect for

harassment can violate a person's due process, freedom of speech, or Fourth Amendment rights," id. at 11; and (3) "Defendants Pichler and Carroll . . . could not have understood that their actions would violate Plaintiff's constitutional rights," id. at 9.  Farrelly contends that Officer Pichler and Lt. Carroll are not entitled to qualified immunity because the unconstitutionality of RSA 644:4, I(f) was clearly established by the New Hampshire Supreme Court's decision in Pierce.  While Farrelly argues that "an arrest under section (b) [of RSA 644:4, I] would have resulted in the same free speech violation as an arrest under Subsection (f)," Pl.'s Mem. of Law (doc. no. 38-1), at 11-12, he does not say how it was clearly established that an arrest under RSA 644:4, I(b) would have violated his constitutional rights, nor does he make any argument that a reasonable police officer would have known that such an arrest would have violated his constitutional rights.  The court begins by outlining the relevant legal principles and then applies those principles to the facts of this case.

"[P]ublic officials [are entitled] to qualified immunity from personal liability arising out of actions taken in the exercise of discretionary functions." Glik v. Cunliffe, 655 F.3d 78, 81 (1st Cir. 2011) (citing Harlow v. Fitzgerald, 457

U.S. 800, 807 (1982); Barton v. Clancy, 632 F.3d 9, 21 (1st Cir.

2011)).[9]  Turning to the mechanics of qualified immunity, courts

> apply a two-prong analysis in determining questions of
> qualified immunity. Maldonado v. Fontanes, 568 F.3d
> 263, 269 (1st Cir. 2009).  These prongs, which may be
> resolved in any order, Pearson [v. Callahan], 555 U.S.
> [223,] 236 [(2009)], require [courts to] decide "(1)
> whether the facts alleged or shown by the plaintiff
> make out a violation of a constitutional right; and
> (2) if so, whether the right was 'clearly established'
> at the time of the defendant's alleged violation,"
> Maldonado, 568 F.3d at 269.

Glik, 655 F.3d at 81 (parallel citations omitted).  "When a

defendant moves for summary judgment on grounds of qualified

immunity, the plaintiff bears the burden of showing infringement

of a federal right."  Lopera v. Town of Coventry, 640 F.3d 388,

395-96 (1st Cir. 2011) (citing Quintero de Quintero v. Aponte-

Roque, 974 F.2d 226, 228 (1st Cir. 1992)).  Determining whether

a constitutional right was "clearly established" involves

inquiries into "(1) the clarity of the law at the time of the

alleged civil rights violation, and (2) whether, given the facts

of the particular case, a reasonable defendant would have

understood that his conduct violated the plaintiff['s]

constitutional rights."  Glik, 655 F.3d at 81 (quoting Barton,

---

[9] In Glik, the court of appeals held that the police
officers who arrested the plaintiff for video recording their
arrest of a third person were not entitled to qualified immunity
because "a citizen's right to film government officials,
including law enforcement officers, in the discharge of their
duties in a public space is a basic, vital, and well-established
liberty safeguarded by the First Amendment."  655 F.3d at 85.

632 F.3d at 22; citing Maldonado, 568 F.3d at 269) (internal
quotation marks omitted).

The doctrine of qualified immunity "protects all state
actors except 'the plainly incompetent [and] those who knowingly
violate the law.'"  Haley v. City of Boston, 657 F.3d 39, 47
(1st Cir. 2011) (quoting Malley v. Briggs, 475 U.S. 335, 341
(1986)).[10]  Qualified immunity does not, however, "shield public
officials who, from an objective standpoint, should have known
that their conduct was unlawful."  Haley, 657 F.3d at 47
(quoting Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir. 2006);
citing Davis v. Scherer, 468 U.S. 183, 193 (1984)).

The crux of Count II is Farrelly's claim that defendants
violated his First Amendment right to free speech by arresting
him for sending three e-mails to Corliss on February 18 and one
more e-mail on February 21, 2009.  Rather than undertaking the
complex legal analysis necessary to decide whether Farrelly has
made out a First Amendment violation, the court assumes, without
deciding, that Farrelly had a constitutional right to send the

---

[10] In Haley, the court of appeals held that: (1) the
defendant police officers were entitled to qualified immunity
from a due-process claim based on their failure to disclose
certain evidence, because at the time of their actions, it was
not clearly established that police officers, as opposed to
prosecutors, had disclosure obligations under Brady v. Maryland,
373 U.S. 83 (1963), see Haley, 657 F.3d at 47-49; and (2) the
officers were not entitled to qualified immunity from a due-
process claim based on allegations that they "intentionally
conceal[ed] evidence and permit[ed] false testimony to be given
at a defendant's trial," id. at 49.

e-mails at issue, that Officer Pichler violated Farrelly's right to free speech by arresting him for sending them, and that Lt. Carroll violated that same right by approving Farrelly's arrest. Even so, the officers are entitled to qualified immunity because Farrelly's right to send the e-mails in question was not clearly established at the time of his arrest.

As noted above, when determining whether a right is clearly established, for purposes of qualified immunity, the court "must consider two subsidiary issues: (a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case – in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the plaintiff['s] constitutional rights.'" Raiche v. Pietroski, 623 F.3d 30, 38 (1st Cir. 2010) (quoting Maldonado, 568 F.3d at 269). With regard to the first consideration, "[t]o determine whether the law is clear in general, [courts] must define 'the right allegedly violated . . . at the appropriate level of specificity.'" Raiche, 623 F.3d at 38 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)). With regard to the second consideration:

> A finding of qualified immunity is warranted if "a
> reasonable officer could have believed his conduct was
> lawful." Olmeda v. Ortíz-Quiñonez, 434 F.3d 62, 65
> (1st Cir. 2006). Such a finding is not warranted if
> "no reasonable officer could believe" that his conduct

was lawful.  Groh v. Ramirez, 540 U.S. 551, 564
(2004).  Put another way, immunity will issue when
"officers of reasonable competence could disagree" on
the lawfulness of an action, but it will not issue if
"it is obvious that no reasonably competent officer
would have concluded" that the action was lawful.
Malley, 475 U.S. at 342.

Lopera, 640 F.3d at 396 (parallel citations omitted).

Here, at the time of Farrelly's arrest, he had a right to
free speech guaranteed by the First Amendment.  But that defines
the right too broadly.  In Wilson, for example, the Supreme
Court rejected the petitioner' assertion "that any violation of
the Fourth Amendment is 'clearly established,' since it is
clearly established that the protections of the Fourth Amendment
apply to the actions of police."  526 U.S. at 615.  Rather, the
court determined that "the appropriate question [in that case
was] the objective inquiry whether a reasonable officer could
have believed that bringing members of the media into a home
during the execution of an arrest warrant was lawful, in light
of clearly established law and the information the officers
possessed."  Id.; see also Raiche, 623 F.3d at 38-39 ("[T]he
question may be defined specifically as whether prior existing
case law or general Fourth Amendment principles gave Pietroski
notice that it is unconstitutional for a police officer to exert
against a person the considerable force used in this
incident.").  Here, the right at issue is not the right to free

27

speech, but the right to send the specific e-mails that formed the basis for Farrelly's arrest.

To the extent that those e-mails were communications by Farrelly with a person who had notified him of her desire to receive no further communication from him, sent with the purpose to annoy or alarm, and without a lawful purpose or constitutional protection, see RSA 644:4, I(f), Farrelly's right to engage in such conduct was clearly established by the First Amendment and the New Hampshire Supreme Court's decision in Pierce.  Indeed, if RSA 644:4, I, proscribed only the conduct described in section I(f), then an arrest for harassment would have violated a clearly established right, and the officers' entitlement to qualified immunity would rise or fall on whether a reasonable officer could have believed that he or she could arrest Farrelly for sending the e-mails in question without violating his constitutional rights.

But, the harassment statute also prohibits "repeated communications . . . in offensively coarse language with a purpose to annoy or alarm another."  RSA 644:4, I(b). Farrelly's right to engage in that kind of conduct was not clearly established at the time he was arrested.  To the contrary, such conduct was, obviously, prohibited by statute. Moreover, in response to an overbreadth challenge similar to the one that was successful in Pierce, the New Hampshire Supreme

28

Court upheld RSA 644:4, I(b) as constitutional.  See State v. Gubitosi, 157 N.H. 720, 728 (2008).  In light of Gubitosi, a reasonable officer could have believed that RSA 644:4, I(b) was constitutional.[11]  Given the state of the law, the dispositive question is whether a reasonable officer could have believed that Farrelly engaged in conduct prohibited by that statute. See Lopera, 640 F.3d at 396.  The court answers that question in the affirmative.

The court begins by noting that the statute is not especially precise, and does not define the terms "repeated communications" or "offensively coarse language."[12]  With regard to the "repeated communications" element, a reasonable officer could conclude that four e-mails sent over the course of two and one half days, including three e-mails sent over the course of two and one half hours, were repeated communications.  With

_____

[11] That is a bit of an understatement; it is difficult to see how a reasonable officer could conclude that RSA 644:4, I(b) was not constitutional.

[12] The statute might even be vulnerable to a "void-for-vagueness" challenge.  See Butler v. O'Brien, 663 F.3d 514, 518 (1st Cir. 2011) ("Under the Constitution, 'a criminal statute must give fair warning of the conduct that it makes a crime.'") (quoting Bouie v. City of Columbia, 378 U.S. 347, 350 (1964)); but see State v. Koetting, 616 S.W.2d 822, 824-26 (Mo. 1981) (upholding, as not unconstitutionally vague, statute proscribing use of "coarse language offensive to one of average sensibility").  In any event, the defendant officers cannot be denied qualified immunity for declining to anticipate a successful legal challenge to a statute they are charged with enforcing when that statute had been ruled constitutional by the state's highest court.

regard to the "offensively coarse language" element, in the second of the February 18 e-mails, Farrelly accused Corliss of turning into a "tramp," Answer, Ex. B. (doc. no. 34-2), at 4, and in the third one, he accused her of spending her tax return on "crazy shit," id. at 5.  Then, in the February 21 Jezebel e-mail, Farrelly called Corliss a "little slut," and, among other things, referred to her "$6,000 TITS."  Id. at 1.  Again, a reasonable officer could conclude that the foregoing language, drawn from three of Farrelly's e-mails, was offensively coarse.

Next, a reasonable officer could infer a purpose to annoy from: (1) Farrelly's assertion that he had heard that everyone at Corliss's place of employment had seen her new nipple piercings, id. at 4; (2) his rhetorical question: "WHY HAVE YOU TURNED INTO SUCH A TRAMP?", id.; (3) his rhetorical question: "WHAT'S NEXT?  A TRAMP STAMP?  MORE FALSE ADVERTISING.", id. at 5; (4) the concluding line in the third February 18 e-mail: "HAVE A[N] AWFUL LIFE AND HOPEFULLY HANAH DOESN'T GROW UP TO BE LIKE YOU", id.; and (5) the caption of the February 21 e-mail: "HAPPY 30TH YOU LYING CHEATING HERPES CARRYING JEZEBEL," id. at 1.  While Farrelly has submitted an affidavit in which he states that when sending Corliss the four e-mails, his "intention was not to annoy or alarm her," Pl.'s Obj., Farrelly Aff. (doc. no. 38-3) ¶ 4, what he now says about his intentions, several years after the fact, has no bearing on the reasonableness of the

30

officers' determination, in 2009, that Farrelly sent the e-mails
at issue with an intent to annoy Corliss.  In sum, a reasonable
officer could have believed it was lawful to arrest Farrelly for
sending those four e-mails.

　　　To conclude, qualified immunity is intended to protect all
but "the plainly incompetent [and] those who knowingly violate
the law."  Haley, 657 F.3d at 47.  Here, it cannot reasonably be
argued that the officers knowingly violated Farrelly's First
Amendment rights by arresting him for sending the four e-mails
at issue or by approving the arrest.  Similarly, while the
officers may have erred in determining that the conduct for
which Officer Pichler arrested Farrelly was criminal, rather
than protected by the First Amendment, it cannot reasonably be
argued that it was plainly incompetent for the officers to make
that determination.  Thus, Officer Pichler and Lt. Carroll are
entitled to qualified immunity from Farrelly's First Amendment
claim.

### b. "Municipal Immunity"

　　　While the defendant officers are entitled to qualified
immunity, that does not protect the City from liability on
Farrelly's Monell claim because "it is not impossible for a
municipality to be held liable for the actions of lower-level
officers who are themselves entitled to qualified immunity"
Estate of Bennett v. Wainwright, 548 F.3d 155, 177 (1st Cir.

2008), abrogated on other grounds by Maldonado, 568 F.3d at 269,
(quoting Joyce v. Town of Tewksbury, 112 F.3d 19, 23 (1st Cir.
1997); citing Walker v. Waltham Hous. Auth., 44 F.3d 1042, 1047
(1st Cir. 1995)); see also Kennedy v. Town of Billerica, 617
F.3d 520, 536 (1st Cir. 2010) ("the Town may be liable [on a
Monell claim] even if individual officers are ultimately
exonerated, for instance because the officers are granted
qualified immunity").  Defendants argue that the City is
entitled to judgment as a matter of law on Farrelly's First
Amendment Monell claim because Officer Pichler and Lt. Carroll
did not violate Farrelly's rights under the First Amendment and
because, even if they had, Farrelly has not identified any
municipal policy or custom that caused the First Amendment
violation he claims.  While the lack of an underlying
constitutional violation will scuttle a Monell claim, see
Heller, 475 U.S. at 799, it has not been established that
Officer Pichler and Lt. Carroll did not violate Farrelly's
rights under the First Amendment.  Accordingly, defendants'
first argument fails.

    With regard to defendants' second argument, it is somewhat
inaccurate to say that Farrelly has not identified a municipal
policy or custom that caused his injury.  In paragraph 31 of his
second amended complaint, he alleges that the City "failed to
conduct adequate training and procedures to insure that its

police officers only enforced laws currently in effect."  Second

Am. Compl. (doc. no. 40-1) ¶ 31.  That allegation is echoed in

Counts VII and VIII.  Farrelly, however, makes no allegation

concerning any training, or lack thereof, directed toward the

application laws that were currently in effect, such as RSA

644:4, I(b).

Farrelly does not allege a policy or custom of encouraging

the arrest of people for lawfully exercising their First

Amendment rights.  Such an allegation, however, is not necessary

to state a Monell claim; "[i]n limited circumstances, a local

government's decision not to train certain employees about their

duty to avoid violating citizens' rights may rise to the level

of an official government policy for purposes of § 1983."

Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).  But, as the

Connick Court explained, "[a] municipality's culpability for a

deprivation of rights is at its most tenuous where a claim turns

on a failure to train."  Id. (citing Oklahoma City v. Tuttle,

471 U.S. 808, 822-23 (1985) (plurality opinion).  Thus,

> [t]o satisfy the statute [i.e., § 1983], a
> municipality's failure to train its employees in a
> relevant respect must amount to "deliberate
> indifference to the rights of persons with whom the
> [untrained employees] come into contact."  [City of]
> Canton [v. Harris], 489 U.S. [378,] 388 [(1989)].
> Only then "can such a shortcoming be properly thought
> of as a city 'policy or custom' that is actionable
> under § 1983."  Id., at 389.

Connick, 131 S. Ct. at 1359-60 (parallel citations omitted).

33

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 131 S. Ct. at 1360 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997)) (internal quotation marks and brackets omitted). Accordingly,

> to state a claim for municipal liability, a plaintiff must plead more than mere insufficiency of a municipality's training program.  "[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing."

Marrero-Rodríguez v. Mun'y of San Juan, 677 F.3d 497, 503 (1st Cir. 2012) (quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005)).  In sum, "a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." Haley, 657 F.3d at 51 (quoting Brown, 520 U.S. at 404; citing Monell, 436 U.S. at 694) (internal quotation marks omitted) (emphasis in Brown).

Regarding the ways in which deliberate indifference may be established, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."

Connick, 131 S. Ct. at 1360 (quoting Brown, 520 U.S. at 409).
However, "in a narrow range of circumstances," Connick, 131 S.
Ct. at 1361 (quoting Brown, 520 U.S. at 409) (emphasis added),
"the unconstitutional consequences of failing to train could be
so patently obvious that a city could be liable under § 1983
without proof of a pre-existing pattern of violations."
Connick, 131 S. Ct. at 1361.  In Canton, the Supreme Court
hypothesized that a pattern of constitutional violations might
not be necessary where a municipality provided its police
officers with firearms but failed to train them on the
constitutional limitations on the use of deadly force.  See
Connick, 131 S. Ct. at 1361.  But, in Connick, the Court held
that "[f]ailure to train prosecutors in their Brady obligations
does not fall within the narrow range of Canton's hypothesized
single-incident liability."  Id.  The circumstances of this case
fall closer to the actual situation in Connick than to the
hypothetical posited in Canton.

There are several problems with the Monell claim Farrelly
asserts in Count II.  The first is a logical problem.  The only
training deficiency Farrelly alleges is the City's failure "to
conduct adequate training and procedures to ensure that its
police officers only enforced laws currently in effect."  Second
Am. Compl. § 31.  If Farrelly's First Amendment claim were based
exclusively on the unconstitutionality of arresting him for

35

violating RSA 644:4, I(f), then the training he says the City should have provided its officers may have prevented his arrest. But Farrelly was arrested for sending Corliss four specific e-mails, which conduct implicated both RSA 644:4, I(f) and RSA 644:4, I(b).  Thus, even if the City had provided all the training Farrelly says it should have, and Officer Pichler and Lt. Carroll had been informed that RSA 644:4, I(f) was unenforceable as a result of the Pierce decision, that training would have done nothing to prevent the officers from basing a decision to arrest him on RSA 644:4, I(b).

Beyond that, Farrelly's second amended complaint does not appear to adequately state a failure-to-train claim.  Nowhere does the complaint identify a pattern of constitutional violations similar to the one he says he suffered.  See Connick, 131 S. Ct. at 1360.  Moreover, the complaint includes no allegations about what City officials knew, or should have known, about the alleged inadequacy of the training the City provided its police officers, nor does it allege that any City official consciously chose not to implement training he or she knew or should have known to be necessary.  Then, in the face of defendants' argument that he "failed to present a trialworthy issue that the City's policies reflect a deliberate indifference to constitutional rights," Defs.' Mem. of Law (doc. no. 36-1), at 14, Farrelly has produced no evidence of any sort on that

36

issue.  Rather, he merely points to deposition testimony from Officer Pichler and Lt. Carroll in which they stated that they had not been taught about the Pierce decision or the need to consult the annotations that appear in the criminal code.

Farrelly's failure to allege a pattern of similar constitutional violations would not be fatal to his claim if "the unconstitutional consequences of failing to train [were] patently obvious." Connick, 131 S. Ct. at 1361.  But, the exception allowing for single-incident liability on failure-to-train claims is a narrow one, see id., and is inapplicable to the circumstances of this case.  Arrests in violation of the First Amendment were not a patently obvious result of the way the City taught its police officers about the Pierce decision for at least two reasons.

First, the constitutionality of Farrelly's arrest, under the First Amendment, does not depend on the constitutionality of RSA 644:4, I(f).  His arrest violated the First Amendment only if RSA 644:4, I(b) was also unconstitutional, either on its face or as applied to him, and Farrelly makes no allegations, and has produced no evidence, concerning the adequacy of the training the City provided its officers with regard to the enforcement of RSA 644:4, I(b).  Second, while Officer Pichler and Lt. Carroll may not have been given training in how to read the edition of the criminal code they were issued, they were issued a copy of

the criminal code, which contained information on the <u>Pierce</u>
decision, and their failure to find the <u>Pierce</u> annotation was
hardly a foregone conclusion.  But, more importantly, an arrest
in violation of the First Amendment was not a necessary
consequence of the officers' failure to find the <u>Pierce</u>
annotation in their copy of the criminal code, given the
availability and applicability of RSA 644:4, I(b).  Accordingly,
the failure-to-train claim Farrelly asserts does not fit within
the narrow exception for claims in which a municipality's
deliberate indifference may be proven without a pattern of
constitutional violations.

### c. Summary

Officer Pichler and Lt. Carroll are entitled to qualified
immunity from Farrelly's First Amendment claim.  Moreover,
Farrelly has neither adequately alleged a <u>Monell</u> claim based on
inadequate training nor produced evidence to create a triable
issue on such claim.  Accordingly, all three defendants are
entitled to judgment as a matter of law on Count II.

### 3. Count III: Unreasonable Search and Seizure

Without specifying the particular defendant(s) to which it
applies, Count III states, in full:

> The action of Defendants in arresting Plaintiff
> without a warrant under a statute which had been
> previously determined to be unconstitutional violated

the Plaintiff's right against unreasonable search and
seizure.

Second Am. Compl. (doc. no. 40-1) ¶ 35.  In other words, Count
III is a Fourth Amendment false-arrest claim.

As stated in Farrelly's second amended complaint, Count III
includes three words not present in Count III of the amended
complaint: "without a warrant."  The Fourth Amendment, however,
does not prohibit warrantless searches and seizures; it
prohibits "unreasonable searches and seizures."  U.S. Const.
amend. IV.  An arrest is reasonable, and does not violate the
Fourth Amendment, if it is supported by probable cause.  See
Collins, 664 F.3d at 14.  To be sure, "[t]he Fourth Amendment
protects persons from warrantless arrest inside their homes or
other places where they have a reasonable expectation of
privacy."  United States v. Brown, 510 F.3d 57, 64 (1st Cir.
2007) (citing Payton v. New York, 445 U.S. 573, 586-87 (1980);
United States v. Cruz Jiménez, 894 F.2d 1, 6 (1st Cir. 1990)).
But, even so, an exception to the warrant requirement "permits
the police to arrest an individual in his home, without an
arrest warrant, as long as they are lawfully on the premises
. . . and probable cause exists."  United States v. Winchenbach,
197 F.3d 548, 553 (1st Cir. 1999) (citing Mahlberg v. Mentzer,
968 F.2d 772, 775 (8th Cir. 1992); United States v. Houston, 892
F.2d 696, 701-02 (8th Cir. 1989); Jones v. City of Denver, 854

F.2d 1206, 1209 (10th Cir. 1988)).  Because Farrelly has neither alleged that Officer Pichler was unlawfully on his premises nor produced any evidence to that effect,[13] both of Farrelly's theories of Fourth Amendment liability, i.e., arrest without a warrant and arrest under an unconstitutional statute, turn on the existence of probable cause for his arrest.[14]

Defendants argue that they are entitled to summary judgment on Count III because: (1) there was probable cause for Farrelly's arrest, which renders the arrest lawful under RSA 594:13; (2) Officer Pichler and Lt. Carroll are entitled to qualified immunity; and (3) the City is entitled to municipal immunity from Farrelly's Monell claim.  Farrelly contends that: (1) the Federal Constitution and the policies behind 42 U.S.C. § 1983 trump RSA 594:13; (2) the defendant officers are not entitled to qualified immunity; and (3) the deposition testimony of Officer Pichler and Lt. Carroll demonstrates the inadequacy of the training they were provided by the City.  As with Count II, defendants are entitled to the immunities they claim.

---

[13] Defendants have, in fact, produced uncontroverted evidence that Officer Pichler entered Farrelly's residence with consent, see Pichler Dep. (doc. no. 36-3), at 81, which made Officer Pichler's presence in Farrelly's home lawful.

[14] Under the circumstances of this case, Farrelly's warrantless arrest may have been impermissible under RSA 594:10, I, but while a violation of that statute might support a common-law false-imprisonment claim, it provides no basis for a federal claim under the Fourth Amendment.

a. Qualified Immunity

The qualified-immunity question before the court is whether a reasonable police officer could have believed that there was probable cause to arrest Farrelly.

> "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997). Probable cause "does not require the quantum of proof necessary to convict." United States v. Miller, 589 F.2d 1117, 1128 (1st Cir. 1978).

United States v. Pontoo, 666 F.3d 20, 31 (1st Cir. 2011).  That is, "[t]he focus is not on certitude, but, rather, on the likelihood of criminal activity." Acosta, 386 F.3d at 9 (citing Illinois v. Gates, 462 U.S. 213, 235 (1983); Spinelli v. United States, 393 U.S. 410, 419 (1969); Winchenbach, 197 F.3d at 555). In addition,

> "[t]he question of probable cause . . . is an objective inquiry," and [the court] do[es] not consider the "'actual motive or thought process of the officer.'" Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (internal citation omitted) (quoting Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004)); see also Wren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Instead of considering any subjective motive of an individual officer, "we must view the circumstances from the perspective of a reasonable person in the position of the officer." Holder, 585 F.3d at 504.

Kenney v. Head, 670 F.3d 354, 358 (1st Cir. 2012) (parallel citations omitted).  Finally, "the probable cause inquiry is not

41

necessarily based upon the offense actually invoked by the
arresting officer but upon whether the facts known at the time
of the arrest objectively provided probable cause to arrest."
Jones, 432 F.3d at 41 (citation omitted).

The parties' arguments for and against qualified immunity
with respect to Count III are the same arguments they advanced
with respect to Count II, and need not be repeated here.  In
addition to the general rules governing qualified immunity
discussed above, one additional legal principle comes into play:

> [A] lesser showing is required for an officer to be
> entitled to qualified immunity from a Fourth Amendment
> claim based on a warrantless arrest than to establish
> probable cause.  See Cox v. Hainey, 391 F.3d 25, 31
> (1st Cir. 2004).  Officers are entitled to qualified
> immunity "so long as the presence of probable cause is
> at least arguable."  Ricci v. Urso, 974 F.2d 5, 7 (1st
> Cir. 1992) (quoting Prokey v. Watkins, 942 F.2d 67, 72
> (1st Cir. 1991)).

Glik, 655 F.3d at 88.

Here, it is at least arguable that when he arrested
Farrelly, Officer Pichler had information that would have
allowed a reasonably prudent person to believe that Farrelly had
violated RSA 644:4, I(b).  The same holds true for Lt. Carroll's
approval of the arrest.  The court has already determined, in
the context of Farrelly's First Amendment claim, that a
reasonable officer could have believed that Farrelly's conduct
violated RSA 644:4, I(b).  Given that determination, it
necessarily follows that defendants have met the less-demanding

standard for establishing the officers' entitlement to qualified immunity from Farrelly's Fourth Amendment claim.

### b. "Municipal Immunity"

Defendants argue that the City is entitled to judgment as a matter of law on Farrelly's Fourth Amendment <u>Monell</u> claim because Officer Pichler and Lt. Carroll did not violate Farrelly's rights under the Fourth Amendment and because, even if they had, Farrelly has not identified any municipal policy or custom that would have caused the Fourth Amendment violation he claims.  The City is entitled to judgment as a matter of law on the <u>Monell</u> claim asserted in Count III for the same reasons that support judgment as a matter of law on the <u>Monell</u> claim asserted in Count II.

### c. Summary

Officer Pichler and Lt. Carroll are entitled qualified immunity from Farrelly's Fourth Amendment claim.  Farrelly has failed to adequate allege a Fourth Amendment <u>Monell</u> claim. Accordingly, all three defendants are entitled to judgment as a matter of law on Count III.

### 4. Count VII: Failure to Supervise Prosecutorial Function

In Count VII, which names the City as the defendant, Farrelly claims:

> The action of Defendant Concord in failing to educate
> the individual Defendants in regard to a decision of
> the New Hampshire Supreme Court declaring a section of
> the Criminal Harassment Statute unconstitutional more
> than three years prior to Plaintiff's arrest, and in
> failing to train the Defendants in the need to consult
> New Hampshire Supreme Court annotations contained in
> the New Hampshire Criminal Code Annotated when
> enforcing a criminal statute, resulted in the
> individual Defendants causing the Plaintiff's illegal
> arrest.

Second Am. Compl. (doc. no. 40-1) ¶ 42.  Count VII is

coterminous with the Monell claims asserted in Counts II and

III.  Thus, the City is entitled to judgment as a matter of law

on Count VII for the same reasons that support judgment as a

matter of law for the City on Counts II and III.

### B. State Claims

#### 1. Count IV: Malicious Prosecution

In Count IV, without identifying any particular

defendant(s) to which the claim stated therein applies, Farrelly

asserts that defendants are liable for malicious prosecution,

under the common law of New Hampshire, because they prosecuted

him with malice, but without probable cause, and the prosecution

was terminated in his favor.

Defendants argue that they are entitled to summary judgment

on Count IV because: (1) there was probable cause for Farrelly's

arrest, which renders the arrest lawful under RSA 594:13; (2)

they are entitled to immunity under RSA 507-B:5; and (3) the

defendant officers are entitled to official immunity, while the City is entitled to vicarious official immunity.  Farrelly contends that defendants are not entitled to any of the immunities they claim.  Defendants' third argument, based on official immunity, is dispositive.

Under the common law of New Hampshire, and under the circumstances of this case, "[t]o succeed in an action for malicious prosecution, [Farrelly] must prove that he was subjected to a criminal prosecution instituted by the defendant[s] without probable cause and with malice, and that the criminal proceeding terminated in his favor."  Hogan v. Robert H. Irwin Motors, Inc., 121 N.H. 737, 739 (1981) (quoting Stock v. Byers, 120 N.H. 844, 845 (1980); citing Robinson v. Fimbel Door Co., 113 N.H. 348, 350 (1973)) (internal quotation marks omitted).  Under New Hampshire law, "[p]robable cause in the malicious prosecution context has long been defined as such a state of facts . . . as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty."  Forgie-Buccioni v. Hannaford Bros., Inc., 413 F.3d 175, 182 (1st Cir. 2005) (quoting Stock, 120 N.H. at 846).

The factual underpinning for Count IV is limited to a single allegation, that Farrelly "was subject to a criminal prosecution instituted by Defendants."  Second Am. Compl. (doc.

no. 40-1) ¶ 36.  Paragraphs 22, 26, and 29-30 of the second
amended complaint suggest that the specific conduct on which
Count IV is based is the charging decision made by Officer
Pichler and Lt. Carroll, as reflected in the criminal complaints
sworn out after Farrelly's arrest.  Accordingly, that conduct is
the focus of the following discussion of official immunity.

Defendants bear the burden of proving their entitlement to
immunity.  See Belcher v. Paine, 136 N.H. 137, 144-45 (1992)
(citations omitted).  Turning to the particular form of immunity
at issue here, the New Hampshire Supreme Court has "adopted . .
. official immunity for municipal police officers."  Everitt v.
Gen. Elec. Co., 156 N.H. 202, 221 (2007).  The plaintiff in
Everitt was a woman who was significantly injured in an
automobile accident caused by a person the defendant police
officer had tested for sobriety, but had declined to detain,
several hours before the accident that injured the plaintiff.
See id. at 204.  Based on its determination "that encouraging
independent police judgment for the protection and welfare of
the citizenry at large must prevail over ensuring common law
civil recourse for individuals who may be injured by errant
police decisions," id. at 219, the court held

>   that municipal police officers are immune from
>   personal liability for decisions, acts or omissions
>   that are: (1) made within the scope of their official
>   duties while in the course of their employment; (2)

46

discretionary, rather than ministerial; and (3) not
made in a wanton or reckless manner.

Id. After adopting the doctrine of official immunity, the court
offered its "caution that the purpose of immunity is to operate
as a bar to a lawsuit, rather than as a mere defense against
liability, and is 'effectively lost if a case is erroneously
permitted to go to trial.'"  Id. at 221 (quoting Sletten v.
Ramsey Cnty., 675 N.W.2d 291, 300 (Minn. 2004); citing
Richardson v. Chevrefils, 131 N.H. 227, 231 (1988)).

Given the conduct on which Count IV is based, it is worth
noting that on the way toward extending the doctrine of official
immunity to municipal police officers, the Everitt court pointed
out that "[p]rosecutors . . . enjoy immunity when performing
advocacy functions; that is, functions which are intimately
related to initiating and pursuing judicial proceedings against
a person."  156 N.H. at 215 (citing Belcher, 136 N.H. at 146).
Here, of course, the conduct at issue is the initiation of
judicial proceedings against Farrelly.

When exploring the issue of "[w]hether, and to what extent,
official immunity should be extended to a particular public
official," id. at 216, the New Hampshire Supreme Court noted the
importance of examining "the kind of discretion which is
exercised and whether or not the challenged government
activities require something more than the performance of

ministerial duties," id. (quoting Sletten, 675 N.W.2d at 304).

Then, after listing ten factors that should be weighed when

determining whether a particular category of municipal officials

should be protected by official immunity the court observed:

> A commentator aptly stated the nature of the
> comparison and evaluation of these competing factors:
>
>> Some official conduct is more vulnerable to
>> attack than other conduct.  Some official conduct
>> especially needs a free range of choice that is
>> not hampered by concerns over potential personal
>> liability.  Other official conduct is neither
>> especially vulnerable to complaint nor in need of
>> especially unhampered decision-making.  One who
>> repairs the street can do a good job without
>> provoking a citizen suit; the prosecuting
>> attorney cannot do a good job without provoking
>> anger and, sooner or later, a citizen suit.  Good
>> operation of the prosecutor's office does
>> adversely affect people (usually criminals, but,
>> unavoidably, others as well); good operation of
>> the street repair department does not harm
>> people, but on the contrary makes their travel
>> safer.  Both kinds of work are socially
>> desirable, but one kind, since it is intended to
>> adversely affect others and does so, is more
>> likely to generate claims than the other.  The
>> range of free choice needed in the two kinds of
>> work is also quite different.  The importance of
>> the officer's freedom of decision and the
>> likelihood of unjust suit for honest decision-
>> making are factors to be considered in deciding
>> whether official conduct is "discretionary" and
>> immune or "ministerial" and unprotected.

Everitt, 156 N.H. at 216-17 (quoting W.P. Keeton, et al.,

Prosser and Keeton on the Law of Torts § 132, at 1065 (5th ed.

1984)).  Suffice it to say that the police action that Farrelly

challenges in Count IV is far more akin to the prosecutorial

conduct described in Everitt than it is to the conduct of the
defendant in Everitt that inspired the New Hampshire Supreme
Court to adopt the doctrine of official immunity for municipal
police officers.

Defendants argue that Officer Pichler and Lt. Carroll are
entitled to official immunity from Farrelly's malicious-
prosecution claim because their charging decision was "(1) made
within the scope of their official duties while in the course of
their employment; (2) discretionary, rather than ministerial;
and (3) not made in a wanton or reckless manner."  Everitt, 156
N.H. at 219.  Farrelly contends that Officer Pichler and Lt.
Carroll are not entitled to official immunity because: (1) "the
decision not to arrest [him] for an offense that had been
determined to be unconstitutional was not a discretionary
decision, but a legally obligatory decision that was
ministerial," Pl.'s Mem. of Law (doc. no. 38-1), at 17; and (2)
"the Defendants were so intent on punishing [him] for his
dispute with the daughter of a former officer, that they acted
'with intentional or reckless indifference to [his] federal
constitutional rights,'" id. (quoting Am. Compl. (doc. no. 32) ¶
32).  Neither argument is persuasive.

The court begins by noting that while Farrelly's first
argument focusses on the decision to arrest him, a warrantless
arrest, such as occurred here, is not an act that institutes a

49

criminal prosecution, at least for purposes of a Fourth
Amendment malicious-prosecution claim.  See Harrington, 610 F.3d
at 32 (citing Nieves, 241 F.3d at 54; Singer v. Fulton Cnty.
Sheriff, 63 F.3d 110, 117 (2d Cir. 1995)).  Giving Farrelly the
benefit of the doubt, the court will construe his argument as
being directed toward both the decision to arrest him and the
charging decision.  Still, however, his argument fails.

Farrelly's position is that because RSA 644:4, I(f) had
been held unconstitutional by the time he was charged with
violating it, whatever discretion Officer Pichler and Lt.
Carroll may have had did not extend so far as to cover their
charging him with violating that particular statute.  The
problem with that argument is the way it frames the charging
decision.  The decision facing the officers was not whether to
charge Farrelly with violating RSA 644:4, I(f).  Rather, their
decision had to do with whether to charge Farrelly with a crime
at all, and if so, what crime.  Framed that way, the officers'
conduct involved an exercise of discretion, rather than the
execution of a ministerial task.

The opinion in Everitt, New Hampshire's landmark official-
immunity case, describes the distinction between discretionary
and ministerial acts:

> A discretionary decision, act or omission
> involves the exercise of personal deliberation and
> individual professional judgment that necessarily

reflects the facts of the situation and the
professional goal.  <u>Sletten</u>, 675 N.W.2d at 306; <u>Clark</u>
<u>[v. Univ. of Houston]</u>, 60 S.W.3d [206,] 208 [(Tex.
App. 2001)].  Such decisions include those for which
there are no hard and fast rules as to the course of
conduct that one must or must not take and those acts
requiring the exercise of judgment and choice and
involving what is just and proper under the
circumstances.  <u>Borders [v. City of Huntsville]</u>, 875
So. 2d [1168,] 1178 [(Ala. 2003)].  An official's
decision, act or omission is ministerial when it is
absolute, certain and imperative, involving merely
execution of a specific duty arising from fixed and
designated facts.  <u>Sletten</u>, 675 N.W.2d at 306; <u>Dokman</u>
<u>[v. Cnty. Of Hennepin]</u>, 637 N.W.2d [286,] 296 [(Minn.
Ct. App. 2001)]; <u>Clark</u>, 60 S.W.3d at 208 (ministerial
actions are those which require obedience to orders or
performance of a duty which leave no choice for the
public official).  "Ministerial refers to a duty which
is to be performed in a prescribed manner without the
exercise of judgment or discretion," <u>Mulligan [v.</u>
<u>Rioux]</u>, 643 A.2d [1226,] 1233 [(Conn. 1994)],
(quotations and brackets omitted), and includes those
decisions, acts or omissions "imposed by law with
performance required at a time and in a manner or upon
conditions which are specifically designated, the duty
to perform under the conditions specified not being
dependent upon the officer's judgment or discretion,"
<u>Brumfield [v. Lowe]</u>, 744 So. 2d [383,] 388 [(Miss. Ct.
App. 1999)] (quotation and brackets omitted); <u>see also</u>
<u>Restatement</u> [(Second) of Torts</u> § 895D] comment <u>h</u> at
418 [(1979)] (acts are ministerial when official
administers law "with little choice as to when, where,
how or under what circumstances their acts are to be
done").

156 N.H. at 219-20.

     Here, at the time Officer Pichler and Lt. Carroll drafted

the criminal complaints against Farrelly, they had before them

evidence, including Farrelly's own admissions, suggesting that

he had engaged in conduct described in both RSA 644:4, I(b) and

(f).  In the process of making their charging decision, the

officers: (1) evaluated the written and oral evidence before
them; (2) sought out and construed the relevant criminal
statute(s); and (3) compared Farrelly's conduct to the conduct
proscribed by the applicable statute(s).  All of those tasks
"involve[d] the exercise of personal deliberation and individual
professional judgment."  Everitt, 156 N.H. at 219.  Thus, the
charging decision in this case was the result of a discretionary
rather than a ministerial act.  See Moses v. Mele, No. 10-cv-
253-PB, 2012 WL 1416002, at *6 (D.N.H. Apr. 24, 2012) (holding,
in case where plaintiff did not argue to the contrary, that
police officer who issues criminal complaint performs
discretionary rather than ministerial act).

　　　　In addition to showing that Farrelly seeks to hold Officer
Pichler and Lt. Carroll liable for their performance of a
discretionary act, defendants must also show that the officers'
charging decision was "not made in a wanton or reckless manner."
Everitt, 156 N.H. at 219.  While the Everitt opinion devotes
considerable attention to describing the distinction between
discretionary acts and ministerial acts, see id. at 219-21, it
does not define the terms "wanton" or "reckless."  In reliance
on an opinion in a case that did not involve official immunity,
defendants say that "[c]onduct is wanton or reckless when it is
taken with disregard to or indifference to consequences under
circumstances involving danger to life or safety of others."

Defs.' Mem. of Law (doc. no. 36-1), at 20 (citing Migdal v.
Stamp, 132 N.H. 171, 176 (1989)).  For his part, Farrelly says
that defendants' intent to punish him for his dispute with the
daughter of a former colleague drove them to act "with
intentional or reckless indifference to [his] federal
constitutional rights."  Pl.'s Mem. of Law (doc. no. 38-1), at
17.  The court does not agree.

In Moses, Judge Barbadoro noted that "[t]he New Hampshire
Supreme Court has provided little guidance in the official
immunity context as to what might constitute 'wanton or
reckless' conduct."  2012 WL 1416002, at *7.  In reliance on an
opinion of that court in the area of sovereign immunity, Judge
Barbadoro determined that government employees do not engage in
wanton or reckless conduct that would subject them to liability
for malicious prosecution "if they act[ ] with a reasonable
belief in the lawfulness of their conduct."  Id. (citing Opinion
of the Justices, 126 N.H. 554, 564-65 (1985)).  He also noted
that "'reckless or wanton' is a mens rea that is greater than
negligence but less than intentional."  Moses, 2012 WL 1416002,
at *7 (citing Thompson v. Forest, 136 N.H. 215, 220 (1992);
Migdal, 132 N.H. at 176).  Then, he determined that the police
officer in the case before him was entitled to official immunity
because, from both a subjective and an objective perspective,
the officer had a reasonable belief that there was probable

cause to prosecute the plaintiff.  A similar conclusion is
warranted here.

As in Moses, "[o]n the subjective level, there is simply no
evidence in the record to support a claim that [Officer Pichler
or Lt. Carroll] believed that [they] lacked probable cause when
[they] elected to proceed with [Farrelly]'s prosecution."  2012
WL 1216002, at *7.  Rather, there is undisputed evidence that
the officers did not know that RSA 644:4, I(f) had been declared
unconstitutional, see Pichler Dep. (doc. no. 36-3), at 16;
Carroll Dep. (doc. no. 36-4), at 16, and thus believed, albeit
erroneously, that the complaints they drafted charged Farrelly
with violating a valid statute.  Moreover, Farrelly identifies
nothing to support a conclusion that the officers knew they
lacked probable cause for his prosecution.  Accordingly,
defendants have established that from a subjective standpoint,
Officer Pichler and Lt. Carroll held a reasonable belief that
there was probable cause for Farrelly's prosecution.

In Moses, Judge Barbadoro also determined that, on the
objective level, the defendant officer had a reasonable belief
that there was probable cause to prosecute the plaintiff for
witness tampering.  He based that determination on his previous
finding, in the context of a qualified-immunity analysis, that a
reasonable officer could have believed that there was probable
cause to arrest the plaintiff for witness tampering.  See 2012

WL 1416002, at *7.  This case, of course, presents a different
situation; the officers are entitled to qualified immunity from
Farrelly's Fourth Amendment false-arrest claim, but that
immunity is based on the existence of probable cause to believe
that Farrelly's conduct violated RSA 644:4, I(b), not the
portion of the harassment statute he was ultimately charged with
violating.  In any event, the question here is whether, on an
objective level, it was reasonable for Officer Pichler and Lt.
Carroll to believe that there was probable cause to prosecute
Farrelly for violating RSA 644:4, I(f).

Officer Pichler and Lt. Carroll did not pull the language
they used in the complaints against Farrelly out of thin air;
they consulted the edition of the New Hampshire criminal code
that had been issued to them by the Concord Police Department.
That edition, like the official version of the Revised Statutes
Annotated, includes RSA 644:4, I(f), which indicates that,
notwithstanding the New Hampshire Supreme Court's decision in
Pierce, the legislature has never repealed that statute.[15]
Objectively, it is reasonable for a police officer to believe
that he is entitled to enforce a statute printed in the criminal
code he is provided by his employer.  The court's conclusion
might well be different in a case where the defendant was a

---

[15] The same is true for RSA 644:4, I(a), which the New
Hampshire Supreme Court held to be unconstitutional in State v.
Brobst, 151 N.H. 420 (2004).

lawyer, but the standard here is what a reasonable police officer in the position of Officer Pichler or Lt. Carroll would have believed.  In sum, the officers' belief that there was probable cause to prosecute Farrelly for violating RSA 644:4, I(f), based on their understanding that the statute was good law, was objectively reasonable.  The decision to charge Farrelly with violating RSA 644:4, I(f) may have been negligent, but it was not reckless or wanton.

Based on the foregoing, the court concludes that the charging decision Farrelly challenges was: (1) made in the course of the officers' employment and within the scope of their official duties; (2) discretionary; and (3) not wanton or reckless.  Accordingly, Officer Pichler and Lt. Carroll are entitled to official immunity from liability for damages resulting from their decision to charge Farrelly with violating RSA 644:4, I(f).  See Everitt, 156 N.H. at 219.  That leaves the question of the City's liability on Farrelly's malicious-prosecution claim.

Presumably on the assumption that Count IV asserts a claim against the city under a theory of vicarious liability, defendants argue, in reliance on Everitt, 156 N.H. at 221-22, that the City is entitled to vicarious official immunity.  While Farrelly argues that Officer Pichler and Lt. Carroll are not entitled to official immunity, he does not challenge defendants'

argument that, in the event the officers are entitled to official immunity, the City is entitled to vicarious official immunity.

In Everitt, the New Hampshire Supreme Court decided that "[o]fficial immunity, when available to individual public officials, generally may be vicariously extended to the government entity employing the individual, but it 'is not an automatic grant.'"  156 N.H. at 221 (quoting Sletten, 675 N.W. 2d at 300).  Rather, the court established the following standard for determining whether vicarious immunity is appropriate in a particular case:

> Vicarious immunity ought to apply when the very policies underlying the grant of official immunity to an individual public official would otherwise be effectively undermined.  See Sletten, 675 N.W.2d at 300.  In other words, vicarious immunity applies when exposing the municipality to liability would focus "stifling attention" upon the individual official's job performance and thereby deter effective performance of the discretionary duties at issue. Id.; cf. Tilton [v. Dougherty], 126 N.H. [294,] 299 [(1985)] (indemnification of individual state officials does not protect independence in judgment and discretion because individuals still would fear retribution from government that would have to pay the judgment).

Everitt, 156 N.H. at 221-22 (parallel citation omitted).  The circumstances of this case fit within the framework established in Everitt.  The City is entitled to vicarious immunity from liability for the charging decision made by Officer Pichler and Lt. Carroll.

Based on the foregoing, all three defendants are entitled
to judgment as a matter of law on Count IV.

### 2. Count V: False Imprisonment

Without identifying any particular defendant(s) to which it
applies, Count V states, in full:

> Defendants violated Plaintiff's right against false
> imprisonment by detaining him without legal authority.

Second Am. Compl. (doc. no. 40-1) ¶ 40.

Defendants argue that they are entitled to summary judgment
on Count V because: (1) there was probable cause for Farrelly's
arrest, which renders the arrest lawful under RSA 594:13; (2)
they are entitled to immunity under RSA 507-B:5; and (3) the
defendant officers are entitled to official immunity, while the
City is entitled to vicarious official immunity.  With regard to
RSA 594:13, Farrelly contends that Officer Pichler did not have
probable cause to arrest him for violating RSA 644:4, I(b), and
he further contends that defendants are not entitled to any of
the immunities they claim.  The court agrees.

### a. Elements of the Claim

In New Hampshire, "[f]alse imprisonment is the unlawful
restraint of an individual's personal freedom." MacKenzie v.
Linehan, 158 N.H. 476, 482 (2009) (citing Hickox v. J.B. Morin
Agency, Inc., 110 N.H. 438, 442 (1970)).  To prevail on his

58

claim for false imprisonment, Farrelly must

> show that: (1) [the] defendant [officers] acted with
> the intent of confining him within boundaries fixed by
> [the] defendant [officers]; (2) [the] defendant
> [officers'] act[s] directly or indirectly resulted in
> [his] confinement; (3) [he] was conscious of or harmed
> by the confinement; and (4) [the] defendant [officers]
> acted without legal authority.

MacKenzie, 158 N.H. at 482 (citing Restatement (Second) of Torts

§ 35 (1965); Welch v. Bergeron, 115 N.H. 179, 181 (1975)).

Indeed, "[a]n essential element of the [claim] is the absence of

valid legal authority for the restraint imposed." Mackenzie,

158 N.H. at 482 (quoting Welsh, 115 N.H. at 181).  Moreover, "in

the case of detention without a warrant, the defendant, in order

to avoid liability, has the burden of justifying his act by

showing that he had probable cause for imposing the particular

restraint."  Larreault v. First Nat'l Stores, Inc., 93 N.H. 375,

375 (1945) (per curiam) (citations omitted).

### b. Probable Cause

Defendants argue that they are entitled to judgment as a

matter of law on Count V because Officer Pichler had probable

cause to arrest Farrelly, which gave him valid legal authority

for the restraint he imposed on Farrelly.  In New Hampshire,

"[a]n officer has probable cause to arrest when he has

'sufficient, trustworthy information to warrant a reasonable

person to believe that the arrestee has committed a crime.'"

State v. Newcomb, 161 N.H. 666, 669 (2011) (quoting State v.

Vandebogart, 139 N.H. 145, 163 (1994)).  More specifically:

> In determining whether the police had probable cause,
> we review "reasonable probabilities and not the amount
> of evidence required to sustain a conviction or to
> make out a prima facie case."  State v. Jaroma, 137
> N.H. 562, 567 (1993) (quotation omitted).  We are not
> bound by mathematical calculations in making this
> determination, but instead "must approach the issue
> with a concern for the factual and practical
> considerations of everyday life on which reasonable
> and prudent men, not legal technicians, act."
> Vandebogart, 139 N.H. at 163 (quotation omitted).
>
> . . . .
>
> We again emphasize that probable cause is a
> commonsense rather than technical concept and "deals
> with the reasonable probabilities upon which officers
> must act quickly for the protection of society rather
> than with the proof beyond reasonable doubt which the
> State must have to proceed to trial and conviction."
> State v. Hutton, 108 N.H. 279, 287 (1967) (quotation
> omitted).

Newcomb, 161 N.H. at 669-70 (parallel citations omitted).

Regarding who determines whether an arrest is supported by

probable cause, the judge or the jury, the court presumes that

in the false-imprisonment context, the New Hampshire Supreme

Court would adopt the same rules that apply to the determination

of probable cause when a plaintiff brings a claim for malicious

prosecution.  Under those rules:

> The existence of probable cause, in this context, is a
> question for the trier of fact "to the extent that it
> depends upon the credibility of conflicting evidence
> proffered on that issue."  Stock, 120 N.H. at 846.
> "Whether there was probable cause is ultimately,

however, a question of law to be determined by the
court." Id.

Paul v. Sherburne, 153 N.H. 747, 750 (2006) (parallel citations
omitted).

Having described the legal principles pertaining to
probable cause, the court notes one additional wrinkle in this
case: in order for defendants to avoid liability for false
imprisonment, Officer Pichler needed both probable cause to
believe that Farrelly had committed the crime of harassment and
probable cause to believe that the circumstances surrounding
that crime satisfied the statutory requirements for making a
warrantless arrest.  In the absence of sufficient grounds for a
warrantless arrest, the restraint Officer Pichler imposed upon
Farrelly was, necessarily, without legal authority.

Harassment is a misdemeanor.  See RSA 644:4, I.  For
purposes of the following discussion, the court assumes that
Officer Pichler had probable cause to believe that Farrelly had
committed that crime.  However, without a warrant, a police
officer may lawfully arrest a person for committing a
misdemeanor only under certain circumstances, just one of which
is relevant here:

> I. An arrest by a peace officer without a warrant
> on a charge of a misdemeanor or a violation is lawful
> whenever:
>
> . . . .

61

>            (b) He has probable cause to believe that
>       the person to be arrested has within the past 12
>       hours committed abuse as defined in RSA 173-B:1,
>       I against a person eligible for protection from
>       domestic violence as defined in RSA 173-B:1 . . .
>       .

RSA 594:10.  RSA 173-B:1, in turn, defines "abuse" as

>       the commission or attempted commission of one or more
>       of the acts described in subparagraphs (a) through (g)
>       by a family or household member or by a current or
>       former sexual or intimate partner, <u>where such conduct
>       is determined to constitute a credible present threat
>       to the petitioner's safety</u>.  The court may consider
>       evidence of such acts, regardless of their proximity
>       in time to the filing of the petition, which, in
>       combination with recent conduct, reflects an ongoing
>       pattern of behavior which reasonably causes or has
>       caused the petitioner to fear for his or her safety or
>       well-being:
>
>            . . . .
>
>            (g) Harassment as defined in RSA 644:4.

RSA 173-B:1, I (emphasis added).  In other words:

>       "Abuse" is defined as having two elements: (1)
>       commission or attempted commission of one or more of
>       several criminal acts . . . ; and (2) a finding that
>       <u>such misconduct</u> "constitutes a credible threat to the
>       plaintiff's safety," RSA 173-B:1, I.

<u>Walker v. Walker</u>, 158 N.H. 602, 608 (2009) (emphasis added).

With regard to the second element of abuse, "a plaintiff . . .

[must] show more than a generalized fear for personal safety

based upon past physical violence and more recent non-violent

harassment to support a finding that a credible threat to her

safety exists."  <u>Id.</u> (quoting <u>Tosta v. Bullis</u>, 156 N.H. 763,

768, (2008)).  For example, in <u>In re Alexander</u>, 147 N.H. 441

(2002), the New Hampshire Supreme Court reversed the trial court's entry of a final domestic violence restraining order, due to lack of a credible threat to safety, even though: (1) the petitioner alleged that the respondent "had 'shown physical violence in [the] past' and [that] she feared for her personal safety because he owned weapons," id. at 441; (2) "the evening before the hearing, the respondent pulled his car alongside her car and made a rude gesture towards her," id. at 442; and (3) the respondent had contacted the petitioner on numerous occasions by mail, by telephone, and in person, id.

Here, defendants have failed to establish as a matter of law that the circumstances of this case justified a warrantless arrest.  To make a lawful arrest without a warrant, Officer Pichler needed to have probable cause to believe that Farrelly's alleged harassment of Corliss within the previous twelve hours, i.e., the Jezebel e-mail, constituted a credible threat to her safety.

The Jezebel e-mail contained Farrelly's threat that he would show up at Corliss's birthday party at a local restaurant and tell her guests that she had given him herpes and had stolen money from him.  But, objectively, that e-mail contained no threat of violence against Corliss.  Indeed, at his deposition, Officer Pichler testified that "there weren't any specific

references to threats of bodily injury in those e-mails."
Pichler Dep. (doc. no. 36-3), at 58.

    With regard to Corliss's fear of Farrelly, she said nothing
about fearing Farrelly in the written statement she gave Officer
Pichler.  When she spoke with Officer Pichler, she told him
"that there were several instances where Mr. Farrelly's anger,
where he got out of control," id. at 54, "but as far as this
specific instance her main concern was that she didn't want it
to arise to that level.  She felt that if he kept communicating
with her and showed up at her party that something might happen
and she feared for her safety and the safety of her daughter."
Id.  The fear Corliss expressed to Officer Pichler is precisely
the kind of "generalized fear for personal safety based on past
physical violence and more recent non-violent harassment,"
Walker, 158 N.H. at 608, that is insufficient to support a
finding of abuse, see id.

    Finally, after speaking with Corliss, Officer Pichler went
to see Farrelly and found that Farrelly did not "say or do
anything . . . that suggested he was a threat to Ms. Corliss's
safety."  Pichler Dep. (doc. no. 36-3), at 50.  At his
deposition, Officer Pichler indicated that when he arrested
Farrelly, he was unaware of the credible-threat requirement for
a warrantless arrest, see id. at 51, and that, in light of that

requirement, Farrelly should not have been arrested without a warrant, <u>see</u> <u>id.</u>

Based on the foregoing, the court has no difficulty concluding that defendants have not shown, as a matter of law, that Officer Pichler had probable cause to arrest Farrelly without a warrant.  Moreover, notwithstanding Officer Pichler's statement in his arrest report that Corliss told him she was scared that Farrelly was going to come to her birthday party and hurt her or her daughter, <u>see</u> Answer, Ex. A (doc. no. 34-1), at 2, the court harbors substantial doubt as to whether there is even a triable issue regarding probable cause for Farrelly's warrantless arrest.  But, for the moment, it is sufficient to say that defendants have not shown that when Officer Pichler arrested Farrelly, he possessed sufficient information to allow a reasonable person to conclude that Farrelly's alleged harassment constituted a credible threat to Corliss's safety.

### c. Statutory Immunity

Defendants also claim entitlement to statutory immunity. The statute on which they rely for immunity provides that "[n]o governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute."  RSA 507-B:5.  That provision also applies to

municipal employees "acting within the scope of [their] office[s] and in good faith." RSA 507-B:4, IV.

In defendants' view, RSA 507-B:5 shields them from liability for false imprisonment because that cause of action is not "provided by" RSA chapter 507-B or any other New Hampshire statute. Under defendants' reading, RSA chapter 507-B is the legal source that provides causes of action against municipalities, and provides only one kind of action, described as follows:

> A governmental unit may be held liable for damages in an action to recover for bodily injury, personal injury or property damage caused by its fault or by fault attributable to it, arising out of ownership, occupation, maintenance or operation of all motor vehicles, and all premises; provided, however, that the liability of any governmental unit with respect to its sidewalks, streets, and highways shall be limited as provided in RSA 231 and the liability of any governmental unit with respect to publicly owned airport runways and taxiways shall be limited as set forth in RSA 422.

RSA 507-B:2.

Farrelly reads RSA 507-B:5 differently; in his view, that statute does not limit municipal liability to the kinds of claims discussed in RSA 507-B:2. Rather, he construes RSA 507-B:5 as informing potential plaintiffs of various statutory alterations to the common law, such as the limitation on monetary damages provided by RSA 507-B:4. That is, Farrelly regards RSA chapter 507-B not as providing causes of action but

as establishing a set of rules limiting the scope of municipal

liability for claims brought under causes of action provided by

the common law.  Farrelly's argument is persuasive.

RSA chapter 507-B was enacted in response to the New

Hampshire Supreme Court's decision in <u>Merrill v. City of</u>

<u>Manchester</u>, 114 N.H. 722 (1974).  In <u>Merrill</u>, the court

abrogated the judicially created doctrine of municipal immunity

for torts, explaining its decision this way:

> We hold that the immunity from tort liability
> heretofore judicially conferred upon cities and towns
> is hereby abrogated except for the following
> exception.  They are immune from liability for acts
> and omissions constituting (a) the exercise of a
> legislative or judicial function, and (b) the exercise
> of an executive or planning function involving the
> making of a basic policy decision which is
> characterized by the exercise of a high degree of
> official judgment or discretion.
>
> This removal of immunity does not impose absolute
> or strict liability on cities and towns but merely
> places them subject to the same rules as private
> corporations if a duty has been violated and a tort
> committed.  In other words it places responsibility on
> cities and towns under the doctrine of respondeat
> superior for injuries negligently caused by their
> agents, servants and employees in the course of their
> employment.  Furthermore, the legislature has
> authority to specify the terms and conditions of suit
> against cities and towns, limit the amount of
> recovery, or take any other action which in its wisdom
> it may deem proper.

<u>Id.</u> at 729-30 (citations omitted).  The result of <u>Merrill</u> was to

provide potential plaintiffs with a full range of common-law

tort claims against municipalities, except for claims arising

from the exercise of legislative, judicial, executive or planning functions.[16]  In <u>Everitt</u>, the Supreme Court described its decision in <u>Merrill</u>:

> The doctrine of municipal immunity has historically protected local governments from tort liability. <u>Merrill</u>, 114 N.H. at 724.  More than three decades ago, however, this court abrogated the common law doctrine of municipal immunity with limited exception. <u>Id.</u> at 729, 332 A.2d 378.  Consequently, municipalities are subject in most instances to the same rules of liability as private corporations.  <u>Id.</u> at 730.

156 N.H. at 209 (parallel citations omitted).

Based on a careful reading of <u>Merrill</u> and <u>Everitt</u>, the purpose and function of RSA chapter 507-B comes into clearer focus.  By enacting RSA chapter 507-B, the legislature did just what the Supreme Court suggested it might do in <u>Merrill</u>; it "specif[ied] the terms and conditions of suit against cities and towns," 114 N.H. at 730.  Obvious terms and conditions include a consolidation requirement, <u>see</u> RSA 507-B:3, a cap on compensatory damages, <u>see</u> RSA 507-B:4, I, a bar against punitive damages, <u>see</u> RSA 507-B:4, II, an exemption of governmental property from attachment, <u>see</u> RSA 507-B:6, and a statute of limitations, <u>see</u> RSA 507-B:7.

---

[16] It cannot be reasonably argued that Officer Pichler's arrest of Farrelly involved any exercise of the City of Concord's legislative, judicial, executive, or planning functions.

RSA 507-B:2, which defendants read, in conjunction with RSA
507-B:5, as barring any tort claims except for those arising
from the ownership, occupation, maintenance, or operation of
motor vehicles or premises does no such thing.  Rather, it
simply provides that when certain kinds of claims are brought,
the liability of the defendant municipality is limited by two
other statutes, RSA 231 and RSA 422.  It is worth bearing in
mind that the result of Merrill was to subject municipalities
"to the same rules as private corporations if a duty has been
violated and a tort committed."  114 N.H. at 730.  Plainly, in
the wake of Merrill, a municipality could be held liable for
torts such as false imprisonment.  If the legislature had
intended to provide immunity from certain torts or categories of
torts, is could have said so.  But rather than doing that, it
indicated, throughout RSA chapter 507-B, that municipalities
could be held liable for bodily injury, personal injury and
property damage, and it defined personal injury as "[a]ny injury
to the feelings or reputation of a natural person" caused by a
variety of torts, including false imprisonment.  RSA 507-B:1,
III(a).

Merrill exposed municipalities to a wide range – but not
the full range – of tort liability.  There is nothing in either
the plain language or the structure of RSA 507-B that evinces a
legislative intent to substantially restore the municipal

69

immunity abrogated by Merrill.  In the absence of plain language
restoring immunity from claims for torts such as false
imprisonment, defendants cobble together two disparate portions
of RSA 507-B, and identify, as the operative provision, RSA 507-
B:5.  But, RSA 507-B:5 is located between a provision capping
the amount of damages that may be recovered from a municipality
and a provision exempting governmental property from attachment.
Thus, the more reasonable reading of RSA 507-B:5 is to view that
provision as merely another term or condition on suits that may
be brought against municipalities, not as part of a bar against
broad categories of causes of action.

Such a reading of RSA 507-B:5 is reinforced by Everitt.  In
that decision, which was issued long after the decision in
Merrill and the enactment of RSA chapter 507-B, the Supreme
Court still regarded municipalities as "subject in most
instances to the same rules of liability as private
corporations."  Everitt, 156 N.H. at 209.  If defendants'
reading of RSA chapter 507-B were correct, municipalities would
be liable only for claims "arising out of ownership, occupation,
maintenance or operation of all motor vehicles, and all
premises," RSA 507-B:2.  In other words, they would be subject
in some instances, but not most instances, to the same rules of
liability as private corporations, which include the
"constitutional guarantee that every subject is entitled to a

legal remedy for injuries he may receive in his person or
property," Merrill, 114 N.H. at 725 (citation omitted), and "the
basic concept of the law of torts that liability follows
negligence and that individual corporations are responsible for
the negligence of their agents, servants and employees in the
course of their employment," id. (citation omitted).  In sum,
Farrelly's common-law claim for false imprisonment is not barred
by RSA chapter 507-B.

### d. Official Immunity

Defendants also argue that they are entitled to official
immunity from Farrelly's false-imprisonment claim.  As with the
decision Officer Pichler and Lt. Carroll made to charge Farrelly
with violating RSA 644:4, I(f), Officer Pichler arrested
Farrelly in the course of his employment and within the scope of
his official duties.  And, the decision to make the arrest was
discretionary.  The same holds true for Lt. Carroll's
involvement in Farrelly's arrest.  The first two criteria for
official immunity are beyond reasonable dispute.  Thus, so long
as the decision to arrest Farrelly was not wanton or reckless,
Officer Pichler and Lt. Carroll are entitled to official
immunity from liability from the claim asserted in Count V.

When assessing whether the officers' decision to arrest
Farrelly was wanton or reckless, there are two separate aspects

of that decision to consider: (1) the officers' determination
that Farrelly had committed the crime of harassment; and (2)
their determination that a warrantless arrest was justified.
For purposes of the analysis that follows, the court assumes
that the officers did not act in a wanton or reckless manner
when they determined that there was probable cause to arrest
Farrelly for harassment.  That leaves the issue of the
warrantless arrest.  Again, the court follows Judge Barbadoro
and examines both the objective and subjective components of the
decision to arrest Farrelly without a warrant.

In Moses, Judge Barbadoro observed that the New Hampshire
Supreme Court has yet to decide whether there is both an
objective and a subjective component to the standard for
assessing a government official's "reasonable belief" in the
lawfulness of his or her conduct, which, in turn, is relevant to
determining whether that conduct was wanton or reckless.  See
2012 WL 1416002, at *7.  After making that observation, Judge
Barbadoro went on to analyze both the objective and subjective
aspects of the charging decision that was being challenged in
the case before him.  See id.  Because they rely on a dictionary
definition of recklessness drawn from a case that did not
involve immunity of any sort, defendants here do not argue that
the New Hampshire Supreme Court would reject the idea that there
is a subjective component to the recklessness analysis.

Accordingly, this court assumes that the recklessness analysis
has both an objective and a subjective component.  Such an
approach is especially appropriate in this case, as most of the
relevant admissible evidence consists of Officer Pichler's
impressions of Corliss and Farrelly, and his knowledge of the
applicable law.

Objectively, the question in this case is relatively
straightforward: could a reasonable police officer have
determined that there was probable cause to believe that
Farrelly's transmission of the Jezebel e-mail "constitute[d] a
credible threat to [Corliss]'s safety."[17]  RSA 173-B:1, I.  On
its face, the Jezebel e-mail does not include any language that
could reasonably be construed as a threat to Corliss's safety,
and in her written statement to the police, Corliss did not say
anything about being afraid of Farrelly.  On the other hand,
Farrelly did threaten to appear at Corliss's birthday party and
disrupt it by making disparaging comments about her.  Given the
vituperative tone of the e-mail and Farrelly's readily apparent

---

[17] While there was not probable cause for a warrantless
arrest, for the reasons given above, the court presumes that in
the realm of official immunity under New Hampshire law, as with
federal qualified immunity, a "lesser showing is required for an
officer to be entitled to [official] immunity from a [false
imprisonment] claim based on a warrantless arrest than to
establish probable cause," Glik, 655 F.3d at 88; see also Moses,
2012 WL 1416002, at *7 (likening the objective component of the
official-immunity recklessness analysis to the federal standard
for qualified immunity).

antagonism toward Corliss, the court concludes that it is at least arguable that there was probable cause to believe that less than twelve hours before Farrelly was arrested, he had committed an act of harassment that constituted a threat to Corliss's safety.

The subjective component of the analysis, however, is a different story. For defendants, the best that can be said is that, as in Moses, "there is . . . no evidence in the record to support a claim that Officer [Pichler] believed that he lacked probable cause" when he arrested Farrelly. 2012 WL 1416002, at *7. But, Officer Pichler's belief that he had probable cause is a two-edged sword because, as he conceded at his deposition, that belief was based on a substantial misunderstanding of the requirements for making a warrantless arrest: he did not know about the credible-threat requirement.[18]  Moreover, Officer Pichler testified that he and Lt. Carroll both consulted the criminal code before Farrelly was arrested, to determine which

_____

[18] In New Hampshire, it is well established that ignorance of the law provides no excuse for those accused of violating it. See, e.g., State v. Riendeau, 160 N.H. 288, 297 (2010) (citing State v. Stratton, 132 N.H. 451, 457 (1989)).  It would seem ironic, at best, for ignorance of the law to provide a defense against liability for those charged with enforcing it.  Beyond that, one might legitimately ask whether a reasonable police officer would not have known the statutory requirements for making a warrantless arrest.

form(s) of harassment he may have committed.[19]  It would have
been a simple matter for them to have reviewed the statutory
requirements for making a warrantless arrest, but they did not,
notwithstanding Officer Pichler's deposition testimony that the
Concord Police Department has a "[s]trong preference" for
securing a warrant before making an arrest.  Pichler Dep. (doc.
no. 36-3), at 43.  Actively consulting the harassment statute
without also consulting the warrantless-arrest statutes, while
contemplating a warrantless arrest, suggests at least a degree
of recklessness.

    In Moses, Judge Barbadoro determined that the defendant
officer's charging decision was not subjectively reckless in
part because "it [was] undisputed that he sought a supervisor's
advice prior to charging Moses, and that shortly after
initiating the charge, [the officer] obtained a probable cause
determination from a state court judge," 2012 WL 1416002, at *7.
In Judge Barbadoro's view, "[t]hese [were] hardly the actions of
an officer who was acting from a subjective belief that he
lacked probable cause to prosecute," id.

----

[19] With regard to Officer Pichler's subjective understanding
of the threating nature of the Jezebel e-mail, it is worth
noting that he did not even consider arresting Farrelly for
criminal threatening, see Pichler Dep. (doc. no. 36-3), at 39,
nor did he and Lt. Carroll contemplate charging Farrelly with
violating RSA 644:4, I(e), a form of harassment that includes
communications that involve "a threat to the life or safety of
another," see Pichler Dep., at 65-69.

Here, Officer Pichler did seek the advice of a supervisor prior to arresting Farrelly.  But, in contrast with the officer in Moses who obtained a probable cause determination, Officer Pichler did not attempt to obtain an arrest warrant, deeming such an exercise to be "a waste of time," Pichler Dep. (doc. no. 36-3), at 62.  When asked whether Corliss's safety would have been compromised if he had taken the time to get a warrant for Farrelly's arrest, Officer Pichler responded: "I can't answer that question.  I don't know.  I don't know."  Id. at 60.  Moreover, there is undisputed evidence that at the time Officer Pichler arrested Farrelly, he had determined that Farrelly did not "present a credible present threat to [Corliss's] safety." Id. at 51.  In other words, there is no evidence that Officer Pichler harbored a subjective belief that a warrantless arrest was necessary to diffuse a dangerous situation such as those police officers encounter in the immediate aftermath of an incident of domestic violence where both parties are still on the scene and emotions are running high.  Rather, Officer Pichler's deposition testimony suggests that the only time pressure he faced was making sure that he made contact with Farrelly before the twelve-hour limit for making a warrantless arrest had expired.  See id. at 58, 60.

Finally, the plaintiff in Moses did "not point[ ] to any circumstantial evidence that would call into question Officer Mele's intent by tending to show that he did not believe in the lawfulness of his conduct."  2012 WL 1416002, at *7.  Here, there are at least two pieces of circumstantial evidence that call into question Officer Pichler's intent.  The first is his rush to beat the clock and arrest Farrelly before the twelve-hour time limit for a warrantless arrest had expired.  One could reasonably infer from Officer Pichler's haste at least some concern that a magistrate might not find probable cause for Farrelly's arrest.  Second, there is Farrelly's deposition testimony that Officer Pichler told him, after the arrest, that "[t]his is what you get for fucking with a 30-year veteran of the Concord PD," Farrelly Dep. (doc. no. 38-6), at 4.  That is circumstantial evidence that Officer Pichler held a subjective belief that Farrelly's arrest was based on something other than probable cause to believe that he posed a credible threat to Corliss's safety.

The question before the court is whether the defendants have established that Officer Pichler is entitled to official immunity for arresting Farrelly without a warrant.  They have not.  Pichler's own deposition testimony establishes that: (1) notwithstanding the Concord Police Department's preference for arrest warrants, he did not take the time to review the

77

requirements for making a warrantless arrest (including the
credible-threat requirement), but did consult the criminal code
to find crimes for which he could arrest Farrelly; (2) he did
not believe that the Jezebel e-mail constituted a threat to
Corliss; and (3) he did not believe that Corliss's safety would
have been put at risk if he had taken the time to get a warrant
for Farrelly's arrest.  Under the circumstances, the defendants
have not put forth sufficient evidence to immunize Officer
Pichler from liability for arresting Farrelly without a warrant.
This means that neither he nor Lt. Carroll are entitled to
official immunity from the claim stated in Count V.

The court does not make this decision lightly.  There is
undoubtedly a strong societal interest in protecting victims of
domestic abuse, an interest defendants stressed at oral
argument.  At the same time, however, the very statutes enacted
as protection against domestic abuse also protect those accused
of abuse from warrantless arrest unless they pose a credible
threat to the safety of their purported victims.  When given the
opportunity at his deposition to justify his warrantless arrest
of Farrelly, Officer Pichler flatly declined to say that
Farrelly's e-mail, or any other words or conduct, posed a threat
to Corliss's safety.  His only justification for not seeking a
warrant was his belief that he did not need one, a belief that
was based on his ignorance of the laws governing warrantless

arrest.  Under those circumstances, defendants have not shown that Officer Pichler and Lt. Carroll are entitled to the benefit of official immunity.

Finally, because Officer Pichler and Lt. Carroll are not entitled to official immunity, the City, necessarily, is not entitled to vicarious official immunity.

### e. Summary

Defendants have failed to demonstrate that Officer Pichler had probable cause to arrest Farrelly.  Farrelly's suit is not barred by RSA chapter 507-B.  And, under the circumstances of this case, neither Officer Pichler nor Lt. Carroll is entitled to official immunity from Farrelly's false-imprisonment claim. Absent official immunity for the officers, the City is not entitled to vicarious official immunity.  Accordingly, defendants are not entitled to judgment as a matter of law on the state-law claim for false imprisonment stated in Count V.

### 3. Count VI: Violation of the N.H. Constitution

Without identifying any particular defendant(s) to which it applies, Count VI states, in full:

> The action of the Defendants in arresting and prosecuting the Plaintiff under a criminal statute previously determined to be unconstitutional, violated his rights under the Part I, Articles 19 and 22 of the New Hampshire Constitution protecting his right to

free speech and his right against unreasonable search
and seizure.

Second Am. Compl. (doc. no. 40-1) ¶ 41.

Defendants argue that they are entitled to summary judgment
on Count IV because: (1) there was probable cause for Farrelly's
arrest, which renders the arrest lawful under RSA 594:13; (2)
they are entitled to immunity under RSA 507-B:5; and (3) the
defendant officers are entitled to official immunity, while the
City is entitled to vicarious official immunity.  With regard to
RSA 594:13, Farrelly contends that Officer Pichler did not have
probable cause to arrest him for violating RSA 644:4, I(b), and
he further contends that defendants are not entitled to any of
the immunities they claim.

The court begins by noting "that the New Hampshire Supreme
Court has never recognized any constitutional torts that would
serve as causes of action to vindicate the rights protected by
Part I, Articles 19 [and] 22 . . . of the New Hampshire
Constitution."  Bleish v. Moriarty, No. 11-cv-162-LM, 2011 WL
6141271, at *2 (D.N.H. Dec. 9, 2011).  Thus, it is impossible to
say what the elements of the claim(s) in Count VI might be.

Without any guidance from Farrelly on this question, the
court presumes that if the New Hampshire Supreme Court were to
recognize a constitutional tort arising out of Part I, Article
19, of the New Hampshire Constitution, which prohibits

80

unreasonable searches and seizures, the elements of such a tort

would bear a strong resemblance to the elements of false

imprisonment.  Thus, defendants' immunity from liability for the

claims stated in Count V also protects them from Farrelly's

Article 19 claim, presuming that such a claim even exists.

Defining the contours of a constitutional tort arising out of

Part I, Article 22, which guarantees freedom of speech, is an

even more difficult task, given the lack of any cognate common-

law claim.  Presuming that such a claim, if it exists, would

bear a strong resemblance to the federal constitutional claim

stated in Count II, the qualified-immunity analysis that

protects Officer Pichler and Lt. Carroll from liability on Count

II would also serve as the basis for granting them official

immunity from an Article 22 claim.  The City, in turn, would be

protected by vicarious official immunity.  Accordingly, all

three defendants are entitled to judgment as matter of law on

Count VI.

### 4. Count VIII: Negligence

In Count VIII, which identifies the City as the defendant,

Farrelly claims:

> The action of Defendant Concord in failing to educate
> the individual Defendants in regard to a decision of
> the New Hampshire Supreme Court declaring a section of
> the Criminal Harassment Statute unconstitutional more
> than three years prior to Plaintiff's arrest, and in

failing to train the Defendants in the need to consult
New Hampshire Supreme Court annotations contained in
the New Hampshire Criminal Code Annotated when
enforcing a criminal statute, resulted in the
individual Defendants causing the Plaintiff's illegal
arrest.

Second Am. Compl. (doc. no. 40-1) ¶ 43.

Defendants argue that the City is entitled to summary
judgment on Count VIII because: (1) there was probable cause for
Farrelly's arrest, which renders the arrest lawful under RSA
594:13; (2) it is entitled to immunity under RSA 507-B:5; (3) it
is entitled to vicarious official immunity; and (4) it is
entitled to discretionary-function immunity.  With regard to RSA
594:13, Farrelly contends that Officer Pichler did not have
probable cause to arrest him for violating RSA 644:4, I(b), and
he further contends that defendants are not entitled to any of
the immunities they claim.  Defendants' fourth argument is
meritorious.

Discretionary-function immunity, which protects both the
state, see Ford v. N.H. Dep't of Transp., 163 N.H. 284, 294
(2012), and municipalities, see Tarbell Adm'r, Inc. v. City of
Concord, 157 N.H. 678, 683 (2008), "seeks to 'limit judicial
interference with legislative and executive decision-making,'"
id. (quoting Schoff v. City of Somersworth, 137 N.H. 583, 590
(1993)).  "Policy decisions . . . which 'involve[ ] the
consideration of competing economic, social, and political

factors' are precisely the type of municipal planning that
discretionary function immunity seeks to protect."  Tarbell, 157
N.H. at 685 (quoting Mahan v. N.H. Dep't of Admin. Servs., 141
N.H. 747, 750 (1997); citing Gardner v. City of Concord, 137
N.H. 253, 257 (1993)).  In Everitt, the New Hampshire Supreme
Court elaborated:

> In assessing whether the discretionary function
> immunity exception applies in any given case, we
> "distinguish between planning or discretionary
> functions and functions that are purely ministerial."
> Hacking [v. Town of Belmont], 143 N.H. [546,] 549
> [(1999)] (quotation omitted); see Gardner, 137 N.H. at
> 257.  "We have refused to adopt a bright line rule to
> determine whether conduct constitutes discretionary
> planning or merely the ministerial implementation of a
> plan."  Hacking, 143 N.H. at 549-50.  Rather,
> recognizing that the distinction is "sometimes
> blurred," Gardner, 137 N.H. at 257, we adopted the
> following test to discriminate between the different
> functions:
>
> > When the particular conduct which caused the
> > injury is one characterized by the high degree of
> > discretion and judgment involved in weighing
> > alternatives and making choices with respect to
> > public policy and planning, governmental entities
> > should remain immune from liability.
>
> Id.  It is not simply the exercise of a high degree of
> discretion and judgment that distinguishes immune acts
> or omissions from those that are not; the discretion
> or judgment must attach to decisions requiring
> consideration of public policy or planning to be
> protected.  See Mahan v. N.H. Dep't of Admin.
> Services, 141 N.H. 747, 750 (1997).  In particular, we
> distinguish between "policy decisions involving the
> consideration of competing economic, social, and
> political factors" and "operational or ministerial
> decisions required to implement the policy decisions."

>    <u>Id.</u>  Immunity extends only to decisions, acts and
>    omissions for which attaching liability would permit
>    judicial second-guessing of the governing functions of
>    another branch of government.  <u>See</u> <u>id.</u> at 749-50.

156 N.H. at 211 (parallel citations omitted).

In his objection to the application of discretionary-function immunity, Farrelly argues that "[n]one of the decisions challenged in this case, [including] the failure of the City to update the officers on changes in the law, or how to utilize the legal text they were given encompass any discretion."  Pl.'s Mem. of Law (doc. no. 38-1), at 16-17.  Farrelly is mistaken.

First of all, it is not entirely accurate to say that the City failed to update Officer Pichler and Lt. Carroll with regard to the <u>Pierce</u> decision.  It is undisputed that the officers were provided with an edition of the New Hampshire criminal code that included an annotation describing the decision in <u>Pierce</u>.  What Farrelly is actually alleging is that the City had a duty to do something more than that.  But, with respect to training its police officers, any municipality faces all manner of fiscal and other constraints when determining how much training to provide its officers, how to provide that training, and what topics to cover.  Those are policy decisions concerning the allocation of municipal resources, and such

decisions are the heartland of discretionary-function immunity. That doctrine exists for the very purpose of precluding courts from engaging in activities such as setting the curricula and prescribing the teaching methods that municipalities should use when training their police officers.

Because the City is entitled to discretionary-function immunity for its decisions about how to train its police officers, the City is entitled to judgment as a matter of law on Count VIII.

### Conclusion

For the reasons detailed above, Farrelly's motion to amend, document no. 40, is granted, and defendants' motion for summary judgment, document no. 36, is granted in part and denied in part.  This case now consists of Count V, Farrelly's claim for false imprisonment under the common law of New Hampshire. Defendants are entitled to judgment as a matter of law on all of Farrelly's other federal and state claims.  Finally, while defendants' motion for summary judgment was pending, Farrelly moved to certify a question of law to the New Hampshire Supreme Court.  Because the court has construed the statute that is the subject of Farrelly's motion, and has construed it in a way that

is favorable to Farrelly, his motion to certify a question of
law, document no. 46, is denied as moot.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

October 1, 2012

cc:   Charles P. Bauer, Esq.
      H. Jonathan Meyer, Esq.
      Erik Graham Moskowitz, Esq.